Sears Oil Co., Inc. v. Commissioner.
Sears Oil Co. v. Commissioner
Docket No. 374-63.
United States Tax Court
T.C. Memo 1965-39; 1965 Tax Ct. Memo LEXIS 293; 24 T.C.M. (CCH) 207; T.C.M. (RIA) 65039; February 25, 1965
Richard O'C. Kehoe, 516 Mayro Bldg., Utica, N. Y., for the petitioners. Stephen M. Miller, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income taxes of petitioner for the taxable years 1957 and 1958 in the respective amounts of $60,637.40 and $51,560.74. The issues to be decided are (1) whether petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation by permitting earnings and profits to accumulate instead of being divided or distributed; (2) whether bonuses paid by petitioner for early completion of two barges are deductible in the year of payment as business expense; *294 (3) whether towing charges upon the barges from their place of construction to petitioner's place of business are deductible as business expense; and (4) whether respondent has erred in disallowing a portion of the depreciation upon such barges taken upon its income tax returns by petitioner. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of the State of New York on January 5, 1926, and is engaged in business as a dealer in petroleum products. It maintains 12 gasoline service stations under the name of Sears Service Stations, said stations being located in the north-central region of New York State. It is also a supplier of industrial and domestic oils, and kerosene. Petitioner timely filed its corporate Federal income tax returns for the years 1957 and 1958 with the district director of internal revenue, Syracuse, New York. Issue I Petitioner was organized with an authorized capital stock of 5,000 shares common, par value $10 per share, of which 3,957 135/1000 shares were issued and outstanding on December 24, 1934. On December 24, 1934, the authorized capital stock was increased *295 to 20,000 shares common, $10 par value per share. On December 26, 1934, petitioner declared a stock dividend of one and one-half shares for each share then issued and outstanding, and transferred $59,357.03 from surplus and undivided profits to its capital stock account. No additional capital was invested in petitioner as a result of this transaction, and the shareholders treated it as a nontaxable stock dividend. On December 26, 1936, the aforementioned 20,000 shares common, $10 par value per share, was changed to 2,000 shares common, $100 par value per share. The total dollar value of the capital account was not altered by this transaction. On February 2, 1942, the authorized capital stock was increased to 5,000 shares common, $100 par value per share. On June 29, 1942, petitioner declared a stock dividend of one and one-half shares for each share then issued and outstanding, and transferred $150,000 from earned surplus and undivided profits to its capital stock account. No new money was invested in petitioner as a result of this transaction, and the shareholders also treated it as a nontaxable stock dividend. As of the close of business on June 29, 1942, 3,000 of the 5,000 shares *296 authorized were issued and outstanding. On March 12, 1957, the authorized capital stock was changed to 3,000 shares Class A common, $100 par value per share, and 9,000 shares Class B common, $100 par value per share. The difference between the two classes of stock was that the Class A shares were voting shares while the Class B shares were nonvoting shares. Both classes of shares were nonassessable. On February 26, 1958, petitioner declared a stock dividend of 3 shares Class B common stock for each share of Class A common stock then issued and outstanding, and transferred $900,000 from earned surplus and undivided profits to the capital stock account. No additional capital was invested in petitioner as a result of either transaction, and the shareholders also treated it as a nontaxable stock dividend. As of December 31, 1957 and 1958, the capital stock of petitioner was issued and outstanding as follows: NUMBER OF SHARES
1957
1958
Name
Offices held
Relationship
Class A
Class B
Howard P.
Pres., Treas. &
1,395
1,395
4,185
Sears, Sr.
Director
Marion A.
Sec. & Director
Wife of Howard P.
Sears
Sears, Sr.
1,199
1,199
3,597
George H.
Vice-Pres. &
Married to a niece of
Miner
Director
Howard P. Sears, Sr.
3 1/2
3 1/2
10 1/2
Howard P.
Director
Son of Howard P.
Sears, Jr.
Sears, Sr. & Marion
A. Sears
125
125
375
Thomas A.
Asst. Treas. &
Son of Howard P.
Sears
Director
Sears, Sr. & Marion
A. Sears
127 1/2
127 1/2
382 1/2
Barbara S.
Daughter of Howard
DeHimer
P. Sears, Sr. & Mar-
ion A. Sears
125
125
375
Elizabeth S.
Daughter of Howard
Tedd
P. Sears, Sr. & Mar-
ion A. Sears
25
25
75
3,000
3,000
9,000
*297 Petitioner's earned surplus and undivided profits as of December 31, 1957 and 1958 (as adjusted by restoring the amounts of the nontaxable stock dividends), were $1,196,721.19 and $1,324,198.36, respectively. Petitioner was never paid a dividend in cash or other property with the exception of the foregoing stock dividends. Sears Petroleum and Transport Corporation, hereinafter referred to as Petroleum, was organized under the laws of the State of New York in 1940 and is engaged in the petroleum products business and in the operation of a deep water terminal at Albany, New York, hereinafter called the Albany Plant, for the storage and handling of petroleum products. All of petitioner's petroleum products which are shipped to it by tanker (which constitutes the majority of its incoming petroleum shipments) are shipped to and stored in the Albany Plant. Construction of the Albany Plant had commenced some time in 1954 or 1955, and it was put into operation to some extent in 1957. From the date of incorporation through February 15, 1958, the authorized capital stock of Petroleum consisted of 1,000 shares of common stock with a $100 par value per share. On February 15, 1958, Petroleum *298 increased its capital account by authorizing the issuance of 4,000 shares Class B common stock, par value $100 per share, and change the designation of the previously authorized common shares to Class A common. The difference between the two classes of stock is that the Class A common is entitled to vote, while the Class B common is not entitled to vote. During 1958, Thomas A. Sears, Howard P. Sears, Jr., and Barbara S. DeHimer each purchased 600 shares of the Class B common stock for $100 per share. On March 17, 1958, Petroleum declared a stock dividend of one share Class B common stock for each share of Class A common stock then outstanding, and transferred $100,000 from earned surplus and undivided profits to the capital stock account. No new money was put into Petroleum as a result of this transaction, and the shareholders treated it as a nontaxable stock dividend. As of December 31, 1957 and 1958, the capital stock of Petroleum (adjusted for interfamily transfers) was issued and outstanding as follows: Number of shares
1957
1958
Name
Office
Class A
Class B
Howard P. Sears, Sr.
Pres., Treas. & Director
358
358
178
Marion A. Sears
Sec. & Director
390
390
390
Thomas A. Sears
Vice-Pres. & Director
60
60
700
Howard P. Sears, Jr.
Vice-Pres. & Director
60
60
700
George H. Miner
Vice-Pres. & Director
12
12
32
Barbara S. DeHimer
60
60
700
Elizabeth S. Tedd
60
60
100
Total
1,000
1,000
2,800
*299 Petroleum's earned surplus and undivided profits as of December 31, 1957 and 1958 (as adjusted after restoration of the nontaxable stock dividend), were $275,197.68 and $298,836.41, respectively. Petroleum has never declared a taxable dividend. Sears Realty Co., Inc., hereinafter referred to as Realty, is a New York corporation organized on December 12, 1940, for the purpose of owning and developing real estate. The stockholders, officers, and directors of Realty for the years 1957 and 1958, and the number of shares held by each (2,233 common, $100 par value per share) were as follows: Name
Office
Number of shares
Howard P. Sears, Sr.
Pres. & Director
1,203
Marion A. Sears
Sec. & Director
505
Thomas A. Sears
Director
146
Howard P. Sears, Jr.
Director
146
Barbara S. DeHimer
146
Elizabeth S. Tedd
74
George H. Miner
Vice-Pres. & Director
13
Total
2,233
Realty is a real estate company which holds title to 10 of the 12 gasoline service stations operated by petitioner. Petitioner leases these service stations from Realty. Realty also holds title to the following: a barge terminal and storage facility, hereinafter referred to as the Belgium *300 Plant, located near Syracuse, New York; land on which a supermarket is located; and a gasoline station in the city of Utica leased to Marion A. Sears Co. Construction of the Belgium Plant commenced in 1953 and was completed in 1955. As of December 31, 1957 and 1958, Realty had earned surplus and undivided profits of $350,988.87 and $373,591.78, respectively. Realty has never declared a dividend. Sears Apartments, Inc., hereinafter referred to as Apartments, is a New York corporation organized in 1925. During the years in question it held title to the property in which petitioner's main office was located, and operated as an incident to that property a building with small apartments. The stockholders, officers, and directors for the years 1957 and 1958 and the number of shares (282 shares common outstanding, $100 par value per share) held by each were as follows: Name
Office
Number of shares
Howard P. Sears, Sr.
Vice-Pres. & Director
188
Thomas A. Sears
31
Howard P. Sears, Jr.
31
Barbara S. DeHimer
32
Total
282 As of December 31, 1957 and 1958, Apartments had earned surplus and undivided profits of $65,827.48 and $72,480.36, respectively. Apartments *301 has never declared a dividend. M. A. Sears Co., hereinafter known as M. A. Co., is a partnership consisting of Marion A. Sears and Barbara S. DeHimer. The company is engaged in the retail gasoline business and was owned in 1957 and 1958 in the following percentages: Marion A. Sears
30%
Barbara S. DeHimer
70% During the years in question M. A. Co. operated a gasoline service station under the name of Sears Service Station (identical in all respects with the service stations run by petitioner) on property leased from Realty. M. A. Co. paid Realty $6,000 per year as rental therefor. During the years in question M. A. Co. purchased all of its petroleum products from petitioner. Rome Transportation Co., hereinafter referred to as Rome, is a partnership consisting of Thomas A. Sears, Howard P. Sears, Jr., and Barbara S. DeHimer. The sole partnership asset consists of a barge which is used to transport petroleum products in the Hudson River and the Barge Canal in New York State. The partnership was owned in 1957 and 1958 in the following percentages: Thomas A. Sears
33 1/3%
Howard P. Sears, Jr.
33 1/3%
Barbara S. DeHimer
33 1/3% The barge is used *302 to transport petroleum products for petitioner and other oil companies. Formation of each of the related companies, and the construction and expansion in which they engaged, was done primarily for the benefit of petitioner. The expansion by Petroleum was done for the purpose of providing petitioner with storage facilities in the Albany Plant. During the years in question petitioner deducted as rental expense on its returns the amounts of $7,000 in 1957 and $130,400 in 1958 for use of the Albany Plant. As of December 31, 1957 and 1958, petitioner carried on its books as accounts payable to Petroleum the amounts of $9,100 and $130,400, respectively. While petitioner accrued and deducted the full amounts of such rental expense for each year, no money was actually paid in the years so deducted. The expansion by Realty was done for the purpose of providing petitioner with storage facilities in the Belgium Plant. During each of the years 1957 and 1958, petitioner deducted as rental expense on its returns $88,500 for use of the service stations and the Belgium Plant. Similar rental deductions had been taken on petitioner's returns from at least 1948 with respect to the service stations, *303 and at least since 1953 with respect to the Belgium Plant. The amounts as deducted, however, were not paid, the difference between the amounts deducted and the amounts paid being set up on petitioner's books as accounts payable to Realty. As of December 31, 1957 and 1958, petitioner carried on its books such accounts payable to Realty in the amounts of $269,500 and $294,000, respectively, representing the difference between the amounts deducted and the amounts actually paid. Of the $88,500 which petitioner deducted as rental payments to Realty in 1958, only $64,000 was actually paid. Of Rental's rental income in the amounts of $99,300 in 1957 and $98,500 in 1958, $88,500 came from petitioner in each of the years 1957 and 1958. As of December 31, 1957, Realty had accounts receivable of $314,500, of which $269,500 was owed to it by petitioner. As of December 31, 1958, Realty had accounts receivable of $368,000, of which $294,000 was owed to it by petitioner. Of Apartments' rental income in the amounts of $15,125 and $15,665 in the years 1957 and 1958, respectively, $10,560 came from petitioner in each of the years 1957 and 1958. As of December 31, 1957, Apartments had accounts receivable *304 of $78,320, of which $78,240 was owed to it by petitioner. As of December 31, 1958, Apartments had accounts receivable of $86,530, of which $86,450 was owed to it by petitioner. Petitioner carried the $78,240 and the $86,450 on its books as accounts payable. Of the $10,560 which petitioner deducted on its returns for the years 1957 and 1958 as rentals "paid" to Apartments, petitioner paid Apartments only $2,350. During the years in question petitioner rented two gasoline service stations from Marion A. Sears, and deducted as operating expenses on its returns for each of said years a rental for said stations of $5,600. As of December 31, 1957 and 1958, petitioner carried on its books as accounts payable to Marion A. Sears the amounts of $5,600 and $11,200, respectively. Although petitioner accrued and deducted the full amounts of such rentals for each year, no money was actually disbursed. During the years 1957 and 1958, petitioner deducted the following rentals to affiliated companies and members of the Sears family: From whom property
Amount of rental deducted
was rented
Facility rented
1957
1958
Realty
Service stations and
Belgium Plant
$ 88,500
$ 88,500
Petroleum
Albany Plant
7,000
130,400
Apartments
Office Bldg.
10,560
10,560
Marion A. Sears
Service stations (2)
5,600
5,600
Total
$111,660
$235,060
*305 As of December 31, 1957 and 1958, petitioner carried on its books as accounts payable to members of the Sears family and affiliated companies (other than accrued salaries payable) the following: December 31
1957
1958
Realty
$269,500.00
$294,000.00
Apartments
78,240.00
86,450.00
Petroleum
9,100.00
130,400.00
Rome
14,046.08
Marion A. Sears
5,600.00
11,200.00
Total
$362,440.00
$536,096.08
As of December 31, 1957 and 1958, petitioner carried on its books as notes payable to members of the Sears family and affiliated companies the following: December 31
1957
1958
Thomas A. Sears
$ 50,000.00
Howard P. Sears, Jr.
49,450.00
Howard P. Sears, Sr.
441,500.00
$496,000.00
Marion A. Sears
152,000.00
152,000.00
Rome
56,000.00
26,000.00
Petroleum
59,466.89
Total
$748,950.00
$733,466.89 No notes evidenced these payables, and no interest was ever charged, accrued, or paid thereon. These advances were subordinated to the claims of the Hanover and Marine Banks, general creditors were paid in preference to the foregoing, and there were no due dates for the repayments thereof. During 1957 petitioner sold *306 petroleum products to Petroleum in the amount of $115,462.98 and purchased petroleum products from Petroleum in the amount of $84,880.78. During 1955 and 1956 Petroleum borrowed $484,433.33 from the Hanover Bank. During 1956 and 1957 petitioner paid the Hanover Bank $346,433.36 in satisfaction of the loans which the bank had made to Petroleum in 1955 and 1956. Petroleum reimbursed petitioner in the amount of $311,000 in 1957 and the remaining $35,433.36 in 1958. The operations of each of the related companies (petitioner, Apartments, Petroleum, Realty, Rome, and M.A. Co.) were conducted out of the same office. All overhead expense, including depreciation on office equipment, heat, light, water, rent, general expense, telephone, purchase of office equipment, furniture and fixtures, secretarial and stenographic help, etc., was deducted by petitioner on its tax returns and was not allocated among the related companies. The combined earned surplus and undivided profits of the four related corporations as at December 31, 1957 and 1958 (after adjusting for nontaxable stock dividends), none of which have ever declared a taxable dividend, was as follows: Earned surplus and
undivided profits
Corporation
Dec. 31, 1957
Dec. 31, 1958
Petitioner
$1,196,721.19
$1,324,198.36
Petroleum
275,197.68
298,836.41
Realty
350,988.87
373,591.78
Apartments
65,827.48
72,480.36
Total
$1,888,735.22
$2,069,106.91
*307 As of December 31, 1957 and 1958, petitioner had investments in unrelated companies (F. W. Woolworth, The Borden Co., Standard Oil of California, and Texas Gulf Sulphur) in the amounts of $66,494.75 and $66,544.95, respectively. As of December 31, 1957 and 1958, Realty had investments in unrelated companies (Bank of New York, Marine Midland Corp., Texas Company & Gulf Oil Co.) in the amounts of $31,431.64 and $32,120.98, respectively. Petitioner's gross sales, inventory, notes and accounts receivable, fixed assets, cash and investments unrelated to the business of petitioner, taxable net income, net income after taxes, and earned surplus and retained earnings as at December 31 for each of the years 1948 through 1958 were as follows: Notes &
Fixed assets
Dec.
Gross
accounts
after
31
sales
Inventory
receivable
depreciation
1948
Unavailable
$ 701,269.64
$109,423.40
$143,754.16
1949
Unavailable
502,535.70
233,749.51
204,684.08
1950
$1,801,457.17
722,176.16
280,538.67
266,271.19
1951
2,178,265.46
795,331.37
372,311.17
296,186.55
1952
2,502,698.87
794,658.38
393,508.86
247,278.59
1953
3,075,940.98
648,030.74
470,099.11
195,870.39
1954
3,537,630.94
899,555.30
426,057.16
180,461.27
1955
3,933,412.12
1,466,097.69
573,101.01
239,398.85
1956
4,522,959.43
2,121,040.96
421,923.52
209,166.06
1957
5,429,075.41
3,074,992.50
842,348.82
636,339.29
1958
6,945,519.32
3,085,925.67
747,680.01
845,172.33
1948
$140,130.64
$107,579.73
$ 68,200.56
$340,342.64 [1]
1949
163,885.76
75,456.51
47,358.09
388,469.12
1950
188,677.28
93,815.14
59,644.20
448,113.32
1951
109,079.91
117,136.94
63,772.73
501,944.00
1952
92,197.70
112,736.91
60,212.18
562,179.42
1953
113,542.24
112,193.47
59,949.57
622,095.43
1954
99,694.66
167,134.40
86,334.91
708,430.34
1955
80,335.24
161,512.48
83,660.70
792,091.04
1956
125,863.00
180,578.85
92,666.70
882,339.49
1957
156,814.64
203,968.66
105,024.67
987,364.16
1958
213,096.94
246,319.95
125,266.96
214,841.33 [2]
*308 Petitioner had begun borrowing money from the Hanover Bank sometime in the 1930's, and such borrowings continued into 1957 when petitioner ceased dealing with the Hanover Bank and began borrowing from the Marine Midland Trust Co. of New York, hereinafter referred to as the Marine Bank. Sometime in 1956 or 1957 petitioner approached the Hanover Bank for additional credit extensions. Negotiations were conducted and, by letter of August 5, 1957, the Hanover Bank set forth the terms and conditions upon which such additional credit would be given. The terms and conditions were deemed unacceptable to petitioner, and were not accepted. In May 1957, relations with the Hanover Bank had begun to deteriorate, so petitioner commenced negotiations for a line of credit from the Marine Bank. Petitioner had never dealt with the Marine Bank before, the negotiations commencing 3 months prior to the receipt of the August 5, 1957, letter from the Hanover Bank. Howard P. Sears, Sr., hereinafter sometimes referred to as Sears, the president, treasurer, director, and principal *309 stockholder of petitioner, negotiated for the line of credit which was eventually extended to petitioner by the Marine Bank, with Arthur Smyth, hereinafter referred to as Smyth, the administrative vice-president of that bank. Prior to the commencement of negotiations, Sears had not known Smyth. On August 6, 1957, the Marine Bank extended petitioner a $3,000,000 line of credit on the condition that it be guaranteed by Sears, individually, Petroleum, and Realty, the guaranty to be supported by $700,000 in marketable securities. On August 12, 1957, Realty, Petroleum, and Sears executed guarantees of liability, guaranteeing the liability of petitioner to the Marine Bank. On August 20, 1957, petitioner, Realty, and Sears deposited securities with the Marine Bank as collateral for the extension of credit, as aforesaid. Each time petitioner drew funds from the Marine Bank pursuant to the line of credit, it executed a note in evidence of the liability incurred. None of such notes were introduced into evidence. During the years in question petitioner owned two Cadillacs, one of which was used by Sears, the other one being used by his wife, Marion A. Sears. In addition, petitioner owned *310 an Oldsmobile which was used by Thomas A. Sears. Petitioner paid for these cars, claimed depreciation on them, and paid for the necessary gas, oil, and repairs. If earnings and profits of petitioner for 1957 and 1958 had been distributed to shareholders in the form of cash or other property, such shareholders would have incurred additional tax liability, in excess of the tax liability which they reported, as follows: Income tax if
dividends
*02Income
had been declared
tax as
reported
Shareholder
1957
1958
1957
1958
Howard P. Sears, Sr.
$ 8,040.72
$ 6,726.71
$ 46,796.89
$ 49,246.14
Marion A. Sears
9,384.88
8,077.26
42,478.38
44,504.11
Howard P. Sears, Jr.
4,690.84
6,058.49
6,473.14
8,265.16
George H. Miner
$ 1,506.49
$ 1,281.18
$ 1,536.48
$ 1,314.78
Barbara Sears DeHimer
7,287.08
7,110.91
9,603.47
9,498.62
Thomas A. Sears
4,112.33
3,775.80
5,863.63
5,654.35
Elizabeth S. Tedd
823.84
1,399.75
1,038.23
1,635.53
$35,846.18
$34,430.10
$113,790.22
$120,118.69
On September 11, 1962, respondent, by certified mail, mailed to petitioner a notification pursuant to the provisions of section 534 of the Internal Revenue Code *311 of 1954. Petitioner did not serve or cause to be served upon the respondent, prior to the issuance of the notice of deficiency, a statement of alleged grounds and facts pursuant to section 534(c) of the 1954 Code. Ultimate Findings The earnings and profits of petitioner were permitted to accumulate beyond the reasonable needs of its business, and petitioner was availed of for the purpose of avoiding the imposition of income tax with respect to its shareholders or the shareholders of its related corporations by not dividing or distributing such accumulation. Issue II On April 26, 1957, the petitioner entered into a contract with Avondale Marine Ways, Inc., hereinafter referred to as Avondale, of New Orleans, Louisiana, for the construction of a barge for the petitioner at a fixed price of $234,567, to be delivered afloat at Avondale, Louisiana, not later than September 3, 1957. The contract also provided that the petitioner would pay Avondale an additional $200 per day for each day the barge was delivered to petitioner prior to September 3, 1957. On May 20, 1957, petitioner entered into a contract with Avondale for the construction of another barge for the petitioner at a *312 fixed price of $224,567, to be delivered afloat at Avondale not later than October 3, 1957. This contract provided that petitioner would pay Avondale an additional $200 for each day the barge was delivered to petitioner prior to October 3, 1957. Both barges were delivered to petitioner on the same undisclosed date and, in addition to making payment to Avondale of the fixed price of such barges, the petitioner also paid it $7,000 for early delivery of the barges. In its income tax return for 1957 the petitioner deducted the $7,000 as a business expense. Issue III When the barges were delivered to petitioner in Louisiana, they required installation of galleys and Coast Guard equipment and outfitting and inspection before being put into use in the petitioner's business. The petitioner employed and paid the owner of a tugboat $16,000 to tow the barges to Rome, New York, where the required installations, outfitting, and inspection were made. In its income tax return for 1957 the petitioner deducted as a business expense the towing cost of $16,000. Issue IV In its income tax return for 1957 the petitioner, showing the combined cost of the two barges involved herein as $459,134 *313 and computing depreciation thereon at 10 percent on the double-declining balance method, deducted $11,478.35 as depreciation of the barges for that year. The amount deducted represented depreciation on each of the barges for 4 months of 1957. In its income tax return for 1958 the petitioner, again showing the combined cost of the barges as $459,134 and computing depreciation thereon at 10 percent on the double-declining balance method, deducted $44,765.57 as depreciation of the barges for that year. The amount deducted represented depreciation on both barges for the entire year. In determining the deficiency for 1957 the respondent determined that the petitioner was not entitled to any depreciation on either of the barges for 1957 and disallowed the entire deduction of $11,478.35 taken therefor for that year. In determining the deficiency for 1958 the respondent determined that the barges were not put into service before the second quarter of 1958. He allowed $28,928.04 of the deduction taken for that year, $44,765.57, and disallowed the remainder, $15,837.53, stating in the deficiency notice that he used a double-declining balance method based on an estimated life expectancy of *314 25 years from April 1, 1958. The record, however, does not indicate the cost basis of the barges used by respondent in computing allowable depreciation of $28,928.04 for the 9 months' period. On an undisclosed date in December 1957, an undisclosed one of the barges was placed in use by petitioner. The other barge remained in Rome, New York, the entire winter and was not placed in use until May 1958. The useful life of the barges for depreciation purposes was 20 years from the respective dates on which they were placed in service by petitioner. Opinion Issue I It seems clear to us that petitioner herein was availed of for the purpose of avoiding the imposition of the income tax upon its shareholders and the shareholders of its related corporations. Because the petitioner has not proceeded under section 534 of the 1954 Code to serve upon respondent a statement of the facts upon which it relies to establish that its earnings have not been permitted to accumulate beyond its reasonable business needs, the entire burden of proof rests upon petitioner. It has failed to sustain its burden. Petitioner's primary purpose in accumulating its earnings during 1957 and 1958 is stated *315 to be the need for cash to finance the expansion of its business facility. What it actually means by that is that it needed cash to finance the expansion of the facilities of its related corporations, which expansion was admittedly for the primary benefit of petitioner. The record is replete with inconsistencies with such a claimed need for cash. Petitioner had over the period of its entire life carried on its business with borrowed working capital and the record indicates that during the period at issue it had obtained bank credit for that purpose to the extent of $3,000,000. It and some of its affiliates repeatedly and over a period of many years declared and issued stock dividends with a concomitant transfer of its surplus earnings to capital and it did so to the extent of $900,000 in February of 1958, It has never declared or distributed a cash dividend. The expansion claimed by petitioner as being the factor necessitating its accumulation of surplus was largely completed prior to the years at issue. Petitioner and several of its related corporations had substantial investments in enterprises wholly unrelated to petitioner. Petitioner's business and earnings had grown consistently *316 prior to and continued such growth during 1957 and 1958. This record fails entirely not only to show a business need for increased accumulation of petitioner's earnings, but, equally as important, fails to establish any plan which would entail the need for such accumulation. We are not impressed with petitioner's claim that its accumulation of earnings was required by the bank from which it borrowed its operating capital. It is clear that the terms and conditions of the extension of its line of credit are contained in a written document which is part of the lender's business records, yet such document was not offered in evidence. We are justified in assuming that its production would have been to petitioner's detriment. The only other evidence offered, except for that of petitioner's president, relative to such conditions was clearly hearsay, and we give it little, if any, weight. Such testimony as was offered was to the effect that the banking institution which was the source of petitioner's borrowed funds insisted as a condition of its extension of credit to petitioner that petitioner maintain an average checking account balance of from $450,000 to $600,000. We cannot believe *317 that such a condition would be agreed to by either the lender or the borrower other than in writing, and we are convinced that so important a condition, if it existed, must have been specifically set forth in the written document above referred to. The absence of so important an item of evidence leads us to the conclusion that no such provision existed. Petitioner's lack of a plan which would give rise during 1957 or 1958, or any time thereafter, to a business need for accumulation of its earnings, Nemours Corporation, 38 T.C. 585 (1962), affd. 325 F. 2d 559 (C.A. 3, 1963), its accumulation thereof beyond its immediate business needs, I. A. Dress Co., 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976 (1960); Smoot Sand & Gravel Corporation v. Commissioner, 241 F. 2d 197 (C.A. 4, 1957), reversing on other grounds a Memorandum Opinion of this Court, certiorari denied 354 U.S. 922 (1957), its long established policy of increasing its outstanding capital obligation through the declaration and distribution of stock dividends, with, in each case, a transfer *318 of its earnings to capital, W. H. Gunlocke Chair Co. v. Commissioner, 145 F. 2d 791 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court, the ready availability to it of borrowed operating capital, its continuing to hold investments in unrelated businesses and other inconsistencies with a need for cash shown by this record inescapably lead us to the conclusion that petitioner has been availed of during 1957 and 1958 for the purpose of avoiding the imposition of the income tax upon its stockholders and its related corporations, and we so hold. Issue II Petitioner paid a bonus of $7,000 for the early completion of two oil barges. It has deducted such bonuses as business expense for 1957. Respondent has disallowed such deductions and has treated the bonuses as added cost of the barges. This Court has consistently held that, whatever the reason for additional outlays in the acquisition of a capital asset, they constitute expenditures which must be recovered through depreciation over the useful life of the asset. The Columbia Theatre Co., 3 B.T.A. 622 (1926); *319 W. P. Brown & Sons Lumber Co., 26 B.T.A. 1192 (1932), and Hotel Sulgrave, Inc., 21 T.C. 619 (1954). Petitioner contends that under the holding of the Court of Appeals for the Third Circuit in Frank & Seder Co. v. Commissioner, 44 F. 2d 147 (C.A. 3, 1930), and Atwater Kent Mfg. Co. v. Commissioner, 43 F. 2d 331 (C.A. 3, 1930), we should hold to the contrary herein. We think petitioner is not aided by either of such holdings because it has failed to establish, as was true in each of such cases, the petitioner herein had at any time during the years at issue derived any income by the early completion of these assets against which the bonuses could properly be offset. We sustain the respondent's determination on this issue. Issue III Petitioner seeks to deduct, also as a business expense, the cost of towing of the two barges referred to in Issue II from the place where they were constructed to Rome, New York. The record is clear that, when the barges arrived at Rome, they had not been sufficiently completed so that they could pass the necessary Coast Guard inspection and that, at Rome, additional fitting and construction were *320 carried out for that purpose. Galleys were there constructed and fittings required by the Coast Guard were installed. Neither barge was ready for use in petitioner's business on its arrival in Rome. The towing expenditures fall within the same category as the bonuses above discussed and constitute additions to the cost basis of the barges. United States v. Akin, 248 F. 2d 742 (C.A. 10, 1957), and Bay Counties Title Guaranty Co., 34 T.C. 29 (1960), affd. 288 F. 2d 187 (C.A. 9, 1961). Respondent's determination on this issue is upheld. Issue IV This issue involves depreciation on two barges constructed for the petitioner under two contracts entered into on different dates for different stated cost prices, with different stated delivery dates, with each providing for an additional amount or bonus to be paid for delivery prior to the stated delivery date. Although the record shows that both barges were delivered to petitioner on the same undisclosed date and that petitioner paid the builder of the barges an aggregate of $7,000 for their early delivery, the record contains no showing that petitioner made any allocation of the $7,000 between *321 the barges. Since we have held under Issue II that the $7,000 was not deductible as a business expense for 1957, the year in which paid, but constituted an additional cost of the barges, and since the record shows that an undisclosed one of the barges was placed in use by the petitioner in December 1957 and the other in May 1958, it becomes necessary to allocate the $7,000 between the costs of the barges. In the absence of any other basis in the record, we allocate one-half of the $7,000 to each of the barges. For a like reason, we allocate one-half of the towing charges of $16,000, involved in Issue III, to the cost of each of the barges. As we understand the positions of the parties, the remaining questions for disposition under this issue relate to when the barges were placed in service by petitioner and the useful lives of the barges at such time. The evidence shows that an undisclosed one of the barges was placed in service by petitioner in December 1957, the other in May 1958, and that their useful lives were 20 years from the respective times. In the absence of anything to the contrary, we conclude that the barge earliest contracted for is to be treated as the barge placed *322 in service in December 1957. The respondent concedes on brief that petitioner is entitled to depreciation for one month in 1957 and a full year in 1958 for the barge so placed in service. As for the barge placed in service in May 1958, he concedes that petitioner is entitled to depreciation for 8 months in that year. Effect will be given to a recomputation under Rule 50 to our above holdings and the respondent's concessions. Decision will be entered under Rule 50. Footnotes
1. After transfer to the capital account of $209,357.03. ↩
2. After additional transfer to the capital account of $900,000.↩