ESTATE OF RALPH R. KRIESEL, TRANSFEREE OF THE ASSETS OF RALPH R. KRIESEL COMPANY, CARL W. CUMMINS, JR., AND FIRST TRUST COMPANY OF ST. PAUL, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kriesel v. Commissioner
Docket No. 647-75.
United States Tax Court
T.C. Memo 1978-50; 1978 Tax Ct. Memo LEXIS 464; 37 T.C.M. (CCH) 264; T.C.M. (RIA) 780050; February 6, 1978, Filed William H. Hippee, Jr., and John W. Windhorst, for the petitioner. David J. Duez, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined a liability against the Estate of Ralph R. Kriesel, as transferee, with respect to a deficiency determined against the Ralph R. Kriesel Company (the Kriesel Company), transferor, in the amount of $102,431.02 for the corporation's taxable year ended March 31, 1970. Due to concessions, the sole issue remaining for decision is whether during the taxable year in issue the Kriesel Company was availed of for the purpose of avoiding individual income taxes with respect to its shareholder by permitting its earnings and profits to accumulate rather than being distributed to such shareholder. All of the facts in this case have been stipulated and are so found. [1]
The petitioner, Estate of Ralph R. *467 Kriesel, is the transferee, within the meaning of section 6901, [2] of the assets of the Kriesel Company. The Kriesel Company's Federal income tax return for its fiscal year ended March 31, 1970, was filed with the Internal Revenue Service office at Kansas City, Mo.
The Kriesel Company was organized under the laws of the State of Minnesota on June 2, 1947. From June 2, 1947, until his death on May 20, 1970, Ralph R. Kriesel (Ralph) was the sole shareholder of the Kriesel Company. [3] During the year in issue Ralph served as president and one of the three directors of the Kriesel Company. The Kriesel Company conducted its business through the following divisions and subsidiaries during the year in issue: Percent of Issued and
Outstanding Capital Name of Corporation
Stock Owned by or Division
Kriesel Company
Nature of Business
A & A Credit Co.
Division of Kriesel Co.
Sales Finance
Sunland Terrace
Division of Kriesel Co.
Real Estate
Minneapolis Downtown
(1) Division of Kriesel Co.
Chevrolet Dealership
Chevrolet Co.
from 4/1/69 to 5/31/69
(Downtown Chevrolet)
(2) 100% from 6/1/69 to 6/30/69
(3) 75% from 7/1/69 to 3/31/70
Midway Chevrolet Co.
75%
Chevrolet Dealership
(Midway Chevrolet)
Arrow Chevrolet Co.
(1) 50% from 4/1/69 to 7/18/69
Chevrolet Dealership
(2) 30.6% from 7/19/69 to 8/14/69
(3) Kriesel Co. owned no stock
after 8/14/69
Broadway Finance Co.
100%
Small Loan Company
C. G. Rein Investment Co.
100%
Real Estate
Midway Consumer Credit Co.
97.33%
Industrial Loan and
Thrift Company and
Insurance Agency
AAA Leasing, Inc.
(1) 100% from 4/1/69 to 9/30/69
Automobile and
(2) Kriesel Co. owned no AAA
Equipment Leasing
stock after 10/1/69
*468 Sometime prior to September 27, 1969, an agreement was reached between National Car Rental Systems, Inc. and the Kriesel Company for the sale by the Kriesel Company of all of its AAA Leasing, Inc. stock to National. In order to avoid the recognition by the Kriesel Company of a substantial gain on the sale of this stock, the Kriesel Company adopted a plan of complete liquidation on September 27, 1969, under section 337 of the Code. [4]
The plan of liquidation was subsequently rescinded on September 9, 1970, due to the untimely death of Ralph and the possible adverse income tax consequences to petitioner as the sole shareholder of the Kriesel Company. [5] Nevertheless, such plan was in effect as of the end of the corporation's taxable year ended March 31, 1970. On that date the Kriesel Company intended to liquidate on or before September 26, 1970. Such intent was predicated upon a continuance of the then existing general conditions, however, and was not an intent to liquidate no matter what changes in circumstances might occur. *469 As of March 31, 1970, the reasonable business needs of the Kriesel Company included the following items (but are not conceded by petitioner to be limited to these items): 1. Working capital needs of Downtown Chevrolet. 2.Working capital needs of Midway Chevrolet
3. A contingent Federal income tax liability in the amount of $35,800. The working capital requirements of Downtown Chevrolet and Midway Chevrolet as of March 31, 1970, exceeded the net liquid assets of those companies by $581,672 and $609,684, respectively, if the working capital needs of both companies are computed with a credit cycle and by $1,675,079 and $1,591,315, respectively, if the credit cycle is removed from the computation. The use of credit was an important factor in the operation of the two dealerships. During the taxable year ended March 31, 1970, Downtown Chevrolet and Midway Chevrolet were engaged in the following types of businesses: 1.New car sales. 2. Used car sales. 3. Sales of parts and accessories. 4. Service work. Both companies' purchases of new cars were financed through General Motors Acceptance Corporation (GMAC) in the form of new car trust receipts payable. In *470 all but two circumstances, GMAC was not paid by Downtown Chevrolet and Midway Chevrolet for new cars purchased by them until the new cars were sold. The two exceptions required payment in full to GMAC for a new car used as a demonstrator and for a new car which was traded for a new car of another dealer. During the year ended March 31, 1970, Midway Chevrolet and Downtown Chevrolet traded 141 and 174 vehicles, respectively, with other dealers. The financing of new cars sold by Midway Chevrolet and Downtown Chevrolet varied, depending upon whether the customer was an individual or a corporation. While cash payments were required of individual customers, corporate customers were allowed to charge certain multiunit purchases for periods up to 90 days.
Both Downtown Chevrolet and Midway Chevrolet acquired the bulk of their inventory of used cars from trade-ins by persons purchasing new cars, and they financed these cars internally.
When either dealership accepted a used car as a trade-in on a purchase of a new car, a credit against the purchase price of the new car was allowed to the customer in an amount equal to trade-in value of his used car. If the cash purchase price received *471 by Downtown Chevrolet or Midway Chevrolet was less than the amount payable on the new car trust receipt, these companies used their own funds to complete the payment to GMAC. Parts and accessories purchased by Downtown Chevrolet and Midway Chevrolet were purchased from the Chevrolet Division of General Motors Corporation. The Chevrolet Division of General Motors Corporation required payment in full for all parts and accessories on the tenth day of the month following the month of purchase. Both dealerships permitted customers to charge parts and accessories and service work. Credit terms extended by each dealership to customers for parts and accessories and service work called for payment either on the tenth day of the month following the month of purchase or service work or within 30 days of the date of billing. During the year in issue, Downtown Chevrolet operatned from offices located at 1301 Harmon Place and 1308 Hennepin Avenue, Minneapolis, Minn. (hereinafter sometimes referred to as the "Harmon Place property" and the "Hennepin Avenue property", respectively). The structures located on the Harmon Place property consisted of a two-story, full-basement automotive garage *472 building built in 1930, an attached one-story building and basement addition built in 1944, and a two-level concrete parking ramp built in 1963. The Kriesel Company was owner of an undivided one-half interest in the Harmon Place property and the Hennepin Avenue property. The remaining undivided one-half interest in these properties was owned by Richard F. Holt and a trust created by C. L. Holt for the benefit of Richard F. Holt (hereinafter sometimes referred to collectively as "the Holts" or "the Holt interests"). On June 3, 1963, the undivided one-half interest held by the Holt interests was leased to the Kriesel Company for the use of Downtown Chevrolet at an annual rental of $25,000, payable in equal monthly installments. The lease granted the lessors the option to purchase the Kriesel Company's one-half interest in the properties on or before June 30, 1970, for the purchase price of $300,000, payable in cash. In the event the lessors failed to exercise this option, the Kriesel Company was obligated to purchase from the Holt interests their one-half interest in the properties on June 30, 1970, for a purchase price of $325,000, payable in cash. Sometime in the first *473 half of December 1969, the Kriesel Company and Downtown Chevrolet became dissatisfied with the condition of the building located on the Harmon Place property (the Downtown Chevrolet building). This dissatisfaction resulted from the deterioration of the floors and ceilings of the building. On December 18, 1969, Ralph informed Carl W. Cummins, Jr., an attorney who acted as general counsel for the Kriesel Company, that the Downtown Chevrolet building was in a deteriorated condition and that he was dissatisfied with the ownership and lease arrangement that the Kriesel Company had with the Holts regarding the Harmon Place and Hennepin Avenue properties. Ralph told Cummins that a dispute between the Kriesel Company and the Holts was imminent and he hoped that the Kriesel Company would be able to obtain the undivided one-half interest of the Holts in the Hennepin Avenue property and erect a new building at such location for use by Downtown Chevrolet. On December 31, 1969, Ralph notified the Holts by letter that the Kriesel Company was terminating its lease on the two properties. The letter provided in part as follows: You are further notified that the said termination is made upon *474 the ground that the premises which are the subject of the lease have become untenantable and unfit for occupancy, without fault or neglect on the part of the undersigned [the Kriesel Company]; that various portions of the premises are in a crumbling and deteriorated condition and on several occasions portions thereof have fallen away with suddenness endangering the lives of persons on the premises; that the Building Inspector of the City of Minneapolis has indicated that the premises are in an unsafe and unsound condition; that the premises are in immediate need of substantial structural renovation, improvement and repair. You are further notified that any future possession of any part of the premises by the undersigned [the Krisel Company], from and after January 1, 1970, will be under and by virtue of its rights as a co-tenant and owner of an undivided one-half interest in the fee title to said premises. As of March 31, 1970, the Kriesel Company had not obtained any estimates as to the cost of any repairs and improvements to the Downtown Chevrolet Building or the cost of demolishing the building and constructing a new building. Nor did it know whether it would be less expensive *475 to repair the building or demolish it and construct a new building. However, the Kriesel Company did know that some repairs to the building were necessary. Among the possible means of settling the dispute with the Holts regarding the Downtown Chevrolet building which the Kriesel Company was considering on March 31, 1970, was to exchange its undivided one-half interest in the Harmon Place property for the undivided one-half interest of the Holt interests in the Hennepin Avenue property and to terminate its occupancy at the Harmon Place property. If this exchange had been completed the Kriesel Company would have been required to erect a new building on the Hennepin Avenue property for use by Downtown Chevrolet. On April 3, 1970, a lawsuit was instituted by the Kriesel Company to obtain a judicial decree that the lease was terminated and that the Harmon Place and Hennepin Avenue properties be partitioned by sale, with the proceeds to be divided between the parties. On May 1, 1970, the Holts instituted suit against the Kriesel Company and Downtown Chevrolet seeking a declaratory judgment claiming damages of $925,000 on the following grounds: 1. $50,000 by reason of the Kriesel *476 Company's failure to pay rent under the lease between the parties. 2. $500,000 in punitive damages by reason of the Kriesel Company's failure to pay rent. 3. $375,000 by reason of damages to the Downtown Chevrolet Building caused by the failure of the Kriesel Company to make necessary repairs and to perform necessary maintenance as required by the lease and by certain unauthorized repairs and improvements made by the Kriesel Company. In response, the Kriesel Company filed a counterclaim seeking damages in the amount of $1,117,996 on the following grounds: 1. $15,025.92 for improvements constucted by the Kriesel Company which were the obligation of plaintiffs under the lease. 2. $500,000 for profits lost because of the condition of the Downtown Chevrolet building. 3. $102,970.08 for the cost of construction of a truck service terminal necessitated by the condition of the Downtown Chevrolet building. 4. Approximately $500,000 for profits to be lost as a result of the relocation of the business of Downtown Chevrolet which defendants would be obliged to make because of the condition of the Downtown Chevrolet building. On May 27, 1970, Twin City Testing and Engineering *477 Laboratory, Inc., engineers and chemists, inspected the Downtown Chevrolet building and, on the basis of this inspection, filed a report dated July 14, 1970. Such report provided in part as follows: Based on our investigation at the project, it is our opinion that several areas presently occupied in the structure [the Downtown Chevrolet building] are unsafe.We caution our client that this is not simply a surface maintenance problem, but a structural problem of considerable extent. We recommend consideration be given to completely removing certain areas of the structural floors, followed by reconstruction of the floors under the design and supervision of a structural engineer. In other floors areas, it may be feasible to remove a part of the floor construction (the upper 4" or 3", for instance) and replace that portion of the reinforced concrete with new materials. Engineering counsel should, nevertheless, be sought by our client without delay. On May 28, 1970, the Holt interests attempted to exercise their option to purchase the Kriesel Company's one-half interest in the two properties for $300,000, but the transaction was not closed because of the dispute between the parties. *478 On September 9, 1972, the two lawsuits regarding the Downtown Chevrolet building were settled. The settlement agreement provided that the Kriesel Company would, at its cost, cause certain work to be done to the ramp connected to the Downtown Chevrolet building and would pay back rent from January 1, 1970. The agreement further provided that upon completion of all work required thereunder, the Holts would pay $300,000 to the Kriesel Company for its undivided one-half interest in the properties. As of March 31, 1970, the current liquid assets of the Kriesel Company (treating all receivables due within one year after March 31, 1970, as current liquid assets) exceeded its current liabilities (treating all liabilities payable within one year after March 31, 1970, as current liabilities) by $3,031,925. The current liquid assets of the Kriesel Company (treating all receivables due by September 26, 1970, as current liquid assets) exceeded its current liabilities (treating all liabilities payable by September 26, 1970, as current liabilities) by $2,113,368. [6]
As of *479 March 31, 1970, the Kriesel Company had accumulated earnings and profits of $7,969,709 and current earnings and profits of $597,444. The Kriesel Company has never paid a dividend for any taxable year ending before March 31, 1970. In a notification sent to petitioner by certified mail, respondent informed petitioner, pursuant to Code section 534(d), that he proposed to issue a notice of deficiency for the taxable year ended March 31, 1970, setting forth an amount with respect to the accumulated earnings tax imposed by Code section 531.On August 9, 1974, petitioner timely submitted a statement of grounds upon which petitioner relied to establish that the earnings and profits of the Kriesel Company had not been permitted to accumulate beyond the reasonable needs of its business. Section 531 imposes an additional tax on a corporation described in section 532(a) which is formed or availed of for the purpose of avoiding individual income taxes at the shareholder level by accumulating rather than distributing its earnings and profits. [7]Section 533 provides that an accumulation of earnings *480 and profits of a corporation beyond the reasonable needs of its business shall be determinative of the purpose to avoid income tax with respect to its shareholders unless the corporation provides to the contrary by a preponderance of the evidence. Pursuant to section 537, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. The issue we must decide is whether the Kriesel Company was availed of for the proscribed purpose of avoiding income tax during its fiscal year ended March 31, 1970. It is undisputed that petitioner would be liable as transferee of the Kriesel Company, in the event the accumulated *481 earnings tax asserted against that company is sustained. The first point of contention between the parties concerns placement of the burden of proof as to respondent's allegation that the Kriesel Company accumulated earnings and profits beyond its reasonable business needs as of March 31, 1970. Normally, the burden of proof in proceedings before this Court is on the taxpayer. Under section 534, however, when respondent notifies a taxpayer corporation of his intent to issue a statutory notice of deficiency imposing the tax provided for in section 531, the taxpayer may submit a statement of the relevant grounds, together with facts sufficient to show the basis thereof, on which it relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. Sec. 1.534-2(a)(2), Income Tax Regs. If an adequate statement is timely submitted by the taxpayer, the burden of proof as to whether the accumulation was beyond the reasonable needs of the business is on respondent with respect to the grounds set forth in *482 the taxpayer's statement. In this case, the notification required by section 534(b) was mailed by respondent to petitioner. In response to this notice, petitioner timely filed a statement pursuant to section 534(c) that it contends is sufficient to shift the burden of proof to respondent in this regard. We agree with petitioner in part. The statement submitted by petitioner pursuant to section 534(c) consisted of 47 pages and 19 exhibits. It set forth seven grounds for the Kriesel Company's accumulation of earnings and profits. A portion of this statement was relevant to the taxable year in issue. [8] Petitioner now relies upon six of those grounds: 1. A contingent income tax liability. 2. The working capital shortage of Downtown Chevrolet. 3.The working capital shortage of Midway Chevrolet. 4. The need to provide the initial financing for an automobile and equipment leasing company. 5. The need of Downtown Chevrolet for new facilities. 6. The potential liability created by the threat of a lawsuit relating to the condition of the facilities used by Downtown Chevrolet. *483 We have carefully reviewed the statement submitted by petitioner and the parties' arguments on brief. Respondent has conceded the first ground relied upon by petitioner. With respect to grounds 2 and 3 we conclude that petitioner's statement does meet the general purpose of the statute and is adequate to shift the burden of proof thereon to respondent. John P. Scripps Newspapers v. Commissioner,44 T.C. 453 (1965). In addition, we believe such statement as it relates to grounds 5 and 6 is sufficient to shift the burden of proof thereon to the extent of $325,000. [9] See American Metal Products Corp. v. Commissioner,34 T.C. 89 (1960), affd. 287 F.2d 860 (8th Cir. 1961). Sec. 1.537-2(b) and (c), Income Tax Regs.[10] Petitioner, of course, has the burden of proof except as enumerated above. Welch v. Helvering,290 U.S. 111 (1933).
*484 Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable business needs is a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). The question is primarily one of determining whether the reasonable business needs of the corporation exceeded its freely available (net) liquid assets to meet such needs. See Ivan Allen Co. v. United States,422 U.S. 617 (1975); Smoot Sand & Gravel Corp. v. Commissioner,274 F.2d 495 (4th Cir. 1960), cert. denied 362 U.S. 976 (1960); Faber Cement Block Co. v. Commissioner,50 T.C. 317 (1968); John P. Scripps Newspapers v. Commissioner,supra.
We first turn our consideration to the reasonable business needs of the Kriesel Company. In measuring the Kriesel Company's reasonable business needs as of March 31, 1970, we are faced with an unusual situation. On September 27, 1969, the Kriesel Company adopted *485 a plan of complete liquidation. The plan of liquidation authorized the officers to distribute all of the corporation's assets, except those retained to meet corporate obligations, to its stockholder on or before September 26, 1970. This plan of liquidation was in effect on March 31, 1970, and on such date the Kriesel Company intended to liquidate on or before September 26, 1970. Petitioner concedes that the existence on March 31, 1970, of the Kriesel Company's plan to liquidate necessitates a departure from the traditional analysis of what constitutes a reasonable need of the company's business. Petitioner maintains, however, that the reasonable needs of the business of the Kriesel Company as of March 31, 1970, included the need to retain assets for the reserve for liabilities authorized by its plan of liquidation and all other reasonable needs for which it could reasonably expect to incur expenditures prior to September 26, 1970. Specifically, petitioner relies upon the six grounds previously enumerated as justification for the Kriesel Company's accumulation of earnings and profits during its taxable year ended March 31, 1970. The first ground relied upon by petitioner is *486 that a contingent income tax liability in the amount of $35,800 constituted a reasonable need of the Kriesel Company as of March 31, 1970. Respondent has conceded this point.
The second and third grounds relied upon by petitioner concern the working capital needs of the Kriesel Company. The parties have stipulated that the reasonable business needs of the Kriesel Company included the working capital needs of Downtown Chevrolet and Midway Chevrolet. See sec. 1.537-2(b)(4), Income Tax Regs. The parties are not in agreement, however, on whether the working capital needs of these companies should be computed with the inclusion of a credit cycle. It is agreed that the working capital needs of Downtown Chevrolet and Midway Chevrolet exceeded the net liquid assets of these companies by $581,672 and $609,684, respectively, if a credit cycle is included and by $1,675,079 and $1,591,315, respectively, if the credit cycle is ignored. [11]
*487 In our opinion, the availability of credit or credit cycle is a relevant factor in determining the working capital needs that a prudent businessman would consider in most instances. See Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d 197 (4th Cir. 1957), cert. denied 354 U.S. 922 (1957); sec. 1.537-1(a), Income Tax Regs.
In view of the nature of the business conducted by Downtown Chevrolet and Midway Chevrolet, the credit policy and rate of inventory turnover of each company, and the manner in which the parties have computed the working capital needs of both companies, we are convinced that a credit cycle should be included in the computation of the working capital needs of Downtown Chevrolet and Midway Chevrolet. See Ready Paving & Construction Co. v. Commissioner,61 T.C. 826 (1974). [12] Therefore, we hold that the reasonable business needs of the Kriesel Company included the working capital needs of Downtown Chevrolet and Midway Chevrolet to the extent of $581,672 and $609,684, respectively. *488 The fifth and sixth grounds listed in petitioner's section 534 statement concern the need of Downtown Chevrolet for new facilities and the potential liability of the Kriesel Company to the Holts over the condition of the Downtown Chevrolet building located on the Harmon Place property. The question of whether a corporation may accumulate funds to satisfy a contingent liability or any other need which is contingent upon future events depends upon all the facts and circumstances. William C. Atwater & Co. v. Commissioner,10 T.C. 218, 250 (1948). A corporation may accumulate earnings and profits for a contingent need if it is reasonable for a prudent business firm to expect that such need might arise. On the other hand, an accumulation of earnings and profits is not justifiable if the possibility that such need will occur is remote. Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d 197 (4th Cir. 1957); Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566 (1965). As previously discussed, the Kriesel Company and the Holts each *489 owned an undivided one-half interest in the two properties utilized by Downtown Chevrolet in its business. With respect to the need of Downtown Chevrolet for new facilities, the parties have agreed that among the possible means of settling the dispute with the Holts regarding the Downtown Chevrolet building which the Kriesel Company was considering on March 31, 1970, was to exchange its undivided one-half interest in the Harmon Place property for the Holts' interest in the Hennepin Avenue property and to terminate its occupancy of the Harmon Place property. The parties have further agreed that if this exchange took place, "the Kriesel Company would have been required to erect a new building at 1308 Hennepin Avenue for use by Minneapolis DowntownChevrolet Company." The parties having so agreed, it is reasonable to infer that such an exchange was a real consideration on the part of the Kriesel Company. Since the Kriesel Company would be required to construct new facilities for Downtown Chevrolet if the exchange occurred, we believe it reasonable for the Kriesel Company to retain substantial earnings and profits for this purpose. [13] We are mindful that on March 31, 1970, it *490 was not altogether clear the Kriesel Company could reasonably expect that it might incur all the expenditures in connection with the construction of a new facility for Downtown Chevrolet by September 26, 1970. However, under the circumstances the Kriesel Company could expect that it might enter into a construction contract by September 26, 1970, requiring it to maintain a reserve for its liability under such contract. *491 The record demonstrates that the replacement cost of the Downtown Chevrolet building would have been in excess of $2,000,000. [14] While the Kriesel Company lacked this information as of March 31, 1970, we cannot say that it was unreasonable for the Kriesel Company to anticipate that such cost would be at least $1,600,000. [15] We therefore hold that the need of Downtown Chevrolet for new facilities constituted a reasonable business need of the Kriesel Company as of March 31, 1970, to the extent of $1,600,000. *492 At this point, we pause to consider the amount of net liquid assets available to the Kriesel Company to meet the needs determined thus far. Basically, the amount of a corporation's net liquid assets available to meet its business needs is determined by subtracting the corporation's current liabilities from its current assets. Normally, such assets and liabilities include all accounts receivable and liabilities payable within the next accounting period (usually one year). In the present case, however, the Kriesel Company on March 31, 1970, intended to liquidate by September 26, 1970. Therefore, to accurately reflect the resources available to the Kriesel Company by September 26, 1970, to meet its reasonable business needs until that date, we believe that its current assets and liabilities should include only those accounts receivable and liabilities payable by September 26, 1970. Nor does respondent seriously dispute this point. [16] The parties have stipulated that on March 31, 1970, the Kriesel Company's net liquid assets so computed were $2,113,368. *493 Collating our findings thus far, we conclude that the Kriesel Company's current and anticipated business needs exceeded its net liquid assets as of March 31, 1970. This conclusion is illustrated by the following tabular summary of our findings: Net liquid assets available
$2,113,368
Contingent income tax liability
$ 35,800
Working capital needs: Downtown Chevrolet
$581,672
Midway Chevrolet
609,684
1,191,356
Contingent obligation to construct new
facilities for Downtown Chevrolet
1,600,000
Total current and anticipated needs
$2,827,156
Deficit
[ 713,788)
The substantial deficit in the resources available to the Kriesel Company to meet its current and anticipated needs renders it unnecessary for us to consider petitioner's assertions that it was reasonable for the Kriesel Company to retain earnings and profits: (1) for its potential liability to the Holts as a result of the threat of litigation; (2) to provide the initial financing for an automobile and equipment leasing company; (3) to acquire the Holts' interest in the two properties under the terms of the lease; [17] and (4) to pay $12,500 in rent to the Holts for the period January 1, 1970, through *494 June 30, 1970. Accordingly, we hold that the Kriesel Company did not accumulate earnings and profits during the year in issue beyond the reasonable needs of its business. Having so held, the credit provided for by section 535(c)(1) renders it unnecessary to determine whether the proscribed purpose of avoiding income tax may have existed. See John P. Scripps Newspapers v. Commissioner,supra.
Decision will be entered under Rule 155. Footnotes
1. We have not found it necessary to address all of the arguments proffered by the parties in this case.Therefore, a recital of the facts which pertain to the arguments we do not reach would serve no purpose. Accordingly, they are not set forth in our opinion.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. On May 18, 1970, Ralph left for Chicago to pick up a new cabin cruiser which he intended to sail to Hudson, Wisc. Ralph died on the return trip two days later.↩
4. The amount of such gain would have been $1,244,900.↩
5. Petitioner was concerned that the gain reportable by it on the liquidation would be taxed as income in respect of a decedent, with the result that petitioner would lose the benefit of a stepped-up basis in its Kriesel Company stock under the then existing law. On June 30, 1972, the Kriesel Company was finally liquidated and its assets distributed to petitioner.↩
6. The excess of a company's current liquid assets over current liabilities equals its net liquid assets.↩
7. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.
(a) General Rule.--The accumulated earnings tax imposed by section 531↩ shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
8. A portion of such statement related to the taxable year of the Kriesel Company ended March 31, 1969. That year is not in issue and we express no opinion thereon.↩
9. Respondent conceded on brief that the statement submitted by petitioner was sufficient to shift the burden of proof on this point to the extent of $300,000. ↩
10. The basis for our conclusions regarding placement of the burden of proof is apparent from a reading of the full text of this opinion and it would serve no useful purpose to belabor the point at this juncture.↩
11. The credit cycle as computed by the parties is a fraction, the numerator of which is the average accounts payable for the year ending March 31, 1970, and the denominator of which is the cost of goods sold plus operating expenses for such year. The fraction is then multiplied by 365 to determine the number of days for which payments to suppliers were delayed in the average operating cycle for such year.↩
12. See also Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, on appeal (6th Cir., Dec. 20, 1976); W. L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. per order 551 F.2d 121 (6th Cir. 1977); Bardahl International Corp. v. Commissioner,T.C. Memo. 1966-182↩.
13. The fact that the Kriesel Company did not know precisely how much it would cost to construct new facilities for Downtown Chevrolet if the exchange took place does not mitigate the specificity of the requirement that such building be constructed, as stipulated by the parties. See Rule 91(e), Tax Court Rules of Practice and Procedure.
Furthermore, if the exchange took place, Downtown Chevrolet would certainly have a reasonable business need for a new facility from which to conduct its operation previously carried on at the Harmon Place property. In view of the parties' stipulation that the reasonable business needs of the Kriesel Company as of March 31, 1970, included the reasonable business needs of Downtown Chevrolet, it follows that an accumulation of earnings and profits by the Kriesel Company for this purpose is justified.↩
14. Sometime between May 27, 1970, and August 21, 1970, a local contractor inspected the Downtown Chevrolet building and filed a report, dated August 21, 1970, which provided in part as follows: "Based on our walk through examination, a review of the test reports, and an examination of the plans, we believe that assuring safety and performance of this garage [the Downtown Chevrolet building] for the next 15 year lease period requires replacement of all structural slabs. "In effect, this amounts to erecting a new building within the present structure. Accomplishing this construction without abnormal interference with your operations would increase costs beyond those of a completely new structure. "Construction of a new three story reinforced concrete enclosed garage/service facility in your area would cost $13-17 per square foot. Your existing building has approximately 130,000 square feet. Using $15 per square foot, a new facility would cost $1,950,000 in addition to demolition of the present structure [at Hennepin Avenue] of $250,000." ↩
15. Indeed, the record indicates that Ralph was a shrewd and capable businessman.↩
16. Respondent, on brief, merely assumed that the Kriesel Company's receivables and liabilities payable within 1 year of March 31, 1970, would be included in determining its net liquid assets, without discussing the point.↩
17. $325,000 would have been required for this purpose under the terms of the lease between the Holts and the Kriesel Company. While we did not find it necessary to determine whether such amount constituted a reasonable need of the business of the Kriesel Company, we have conluded that petitioner's statement under sec. 534(c)↩ was sufficient to shift the burden of proof to respondent on this point.