The **SMOOT SAND & GRAVEL COR-PORATION**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 7265.

United States Court of Appeals Fourth Circuit.

Argued Oct. 17, 1956.

Decided Jan. 16, 1957.

As Modified on Rehearing March 8, 1957.

198

David R. Shelton, Washington, D. C., for petitioner.

David O. Walter, Attorney, Department of Justice, Washington, D. C., (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER, FAHY, and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

This is a petition for review of a decision of the Tax Court of the United States upholding an assessment made by the Commissioner of Internal Revenue against the Petitioner, the Smoot Sand and Gravel Corporation, for surtaxes under Section 102(a) of the Internal Reve-

nue Code of 1939.[1] Liability rests upon the finding that the corporation was availed of in the years 1945–1950 for the purpose of preventing the imposition of surtax upon its sole stockholder, Columbia Sand and Gravel Company, Inc., and upon L. E. Smoot, owner of all the common stock of the latter company.

Despite high earnings, petitioner declared no dividend during the period 1945–1950 and, in fact, has declared none since 1932. The statute makes accumulation beyond reasonable needs determinative of the prohibited purpose (to prevent imposition of surtax) "unless the corporation by the clear preponderance of the evidence shall prove to the contrary." Sec. 102(c). The Commissioner found that the corporation did permit the earnings and profits of the petitioner to accumulate beyond the reasonable needs of the business, instead of being divided or distributed, and assessed tax liability for the years in question as follows:

| Year | Alleged Sec. 102 Net Income | Alleged Sec. 102 Surtax |
|---|---|---|
| 1945 | $ 208,223.94 | $ 69,166.22 |
| 1946 | 237,476.03 | 80,428.27 |
| 1947 | 356,230.82 | 126,148.87 |
| 1948 | 319,777.10 | 112,114.18 |
| 1949 | 96,211.21 | 26,458.08 |
| 1950 | 124,915.35 | 37,092.41 |
| | $1,342,834.45 | $451,408.03 |

It is the petitioner's contention that the accumulation of earnings during the taxable years was justified to meet actual or potential needs of the business and that the needs were in fact even greater than its combined surplus and reserves for contingencies. These conflicting contentions present the central issue.

■ The petitioner's testimony took a wide range, bringing into review various phases of the petitioner's business, its history, its policies, its problems, and its plans. The Commissioner concedes that if dividends were withheld in order to maintain reserves not in excess of the reasonable needs of the business, then the penalties of Section 102 do not apply. On an issue that is essentially factual, the scope of our review is limited to determining whether there is substantial evidence to support the findings of the Tax Court, Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; W. H. Gunlocke Chain Co. v. Commissioner, 2 Cir., 145 F.2d 791, and whether the law was correctly applied.

It is not feasible nor would it be useful to repeat in detail the facts which have been fully set forth in the findings and opinion of the Tax Court, but as we proceed, we shall outline the evidence sufficiently to indicate the points in controversy.

The Smoot Sand and Gravel Corporation is engaged in the mining, dredging, and processing of sand and gravel in the District of Columbia, having been organized by L. E. Smoot in 1927 to take over the business begun by him more than a half century ago. The company enjoys a prominent position in the industry,

1. "§ 102. Surtax on corporations improperly accumulating surplus

"(a) *Imposition of tax.* There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

"27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

"38½ per centum of the undistributed section 102 net income in excess of $100,000." 26 U.S.C.A. § 102.

having furnished materials for many of the large public and private construction jobs in the District of Columbia.

As shown in the above table, the five-year accumulation of earnings alleged to be beyond the reasonable needs of this business amounted to $1,342,834.45. On December 31, 1944, the beginning of the period under consideration, and on December 31, 1950, the end of the period, petitioner's books showed the following schedules of reserves for contingencies:[2]

| Reserve for: | Dec. 31, 1944 | Dec. 31, 1950 |
|---|---|---|
| Accrued bond interest | $ 615,203.29 | $ 836,783.29 |
| Contract bonds | 250,000.00 | 250,000.00 |
| Workmen's insurance | 150,000.00 | 200,000.00 |
| Public liability | 100,000.00 | 200,000.00 |
| Fire and tornado insurance | 250,000.00 | 250,000.00 |
| Sand and gravel replacement | 100,000.00 | 100,000.00 |
| Concrete mixing equipment | 500,000.00 | 500,000.00 |
| Columbia Company good will | 293,521.65 | 293,521.65 |
| 1941 income tax | 3,974.25 | ......... |
| 1942 income tax | 16,663.61 | ......... |
| New Southeast plant | 500,000.00 | 500,000.00 |
| Postwar rehabilitation | 1,333,000.00 | 1,333,000.00 |
| Postwar credit | 26,134.38 | ......... |
| Federal income tax, 1944 | 109,112.96 | ......... |
| D. C. income tax | 10,846.38 | 19,608.22 |
| Replacement sand and gravel | 2,578.05 | ......... |
| Total | $4,261,034.57 | $4,482,913.16 [3] |

During this period, however, the petitioner had on hand a large surplus over and above the amounts which it had as reserves. At the beginning of 1945, the total of the reserves and surplus amounted to $6,197,061.88, and at the close of 1950 it had grown to $7,646,805.92. In considering the company's fiscal needs and determining the reasonableness of its accumulation of earnings, it is, of course, necessary to take into account the capital resources it had from time to time in addition to its reserves.

### I.

In 1953, primarily for the purposes of this suit, petitioner, with the aid of the American Appraisal Company, made a reappraisal of its financial needs, repudiating and abandoning as inadequate the schedules theretofore appearing on its books. Throughout these proceedings, petitioner has sought to justify the accumulation of earnings on the basis of this reappraisal, which purports to show that petitioner's true financial needs in

2. The word "reserves" as used in legal and accounting documents is capable of different meanings. The word is used variously to indicate: (1) a fund of cash actually set aside to meet a designated purpose; (2) estimated valuations of assets at less than their book values, such as (a) reserves for bad debts (made in valuing accounts receivable), or (b) reserves for depreciation (set up in estimating reduction in value of depreciable assets); (3) estimated liabilities; or (4) earmarking surplus for certain corporate purposes, to show that the sum is not available for dividends until the purpose for which the reserve is created has been met. It was in this last sense that the word was used by petitioner when it created the schedule of reserves for contingencies.

3. The taxpayer does not agree to the accuracy of the above figures for 1950, which are taken from the Court's findings. Taxpayer claims that the correct figure is $4,738,102.32, a difference of $255,189.16. The original exhibit (Petitioner's Exhibit 14) gives a total in accord with petitioner's claim. However, the figure there appears to result from error in adding the items.

1945 were $13,662,573.11 and gradually increased to $15,809,513.33 by 1950.

■ A large part of this reappraisal consists of allotments for future replacement of various assets used by petitioner in mining and processing sand and gravel, and for expansion of plants and equipment used in the business. Petitioner owns three plants and uses large and expensive machinery and equipment in its operations. During World War II the company was particularly active to the point of strain upon its facilities and claims that reserves were therefore required for rehabilitation. It cannot be disputed that corporate reserves may properly take such objectives into account. But formal entries upon the books do not alone substantiate such needs, nor is justification for such reserves to be found merely in subsequently declared intentions. The intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose. K. O. M. A., Inc., v. Commissioner, 10 Cir., 189 F. 2d 390; Bride v. Commissioner, 8 Cir., 224 F.2d 39. Here the petitioner failed to show that it had during the period 1945–1950 any definite plan for future replacement and expansion out of reserves.

■ The petitioner complains that the Tax Court improperly ignored the entire testimony of petitioner's witnesses regarding the evaluation of sums needed for rehabilitation, even though the Government presented no evidence to rebut these estimates. In this respect, however, the petitioner labors under an obvious misconception. Basically the Tax Court did not undertake to dispute the petitioner's evidence as to the amounts needed for replacement and expansion. These estimates may, indeed, have been correct. Rather, the Court's decision relied upon the fact that these alleged needs were not the considerations upon which petitioner's accumulations of earnings were made. In order to determine whether profits were accumulated for the reasonable needs of the business or to avoid the surtax upon shareholders, the controlling intention of the taxpayer is that which is manifested at the time of the accumulation, not subsequently declared intentions which are merely the products of afterthought. K. O. M. A., Inc., v. Commissioner, supra; Bride v. Commissioner, supra.

## II.

■ The issue of inflation was vigorously argued before us. Although the evidence shows that petitioner did not formulate or initiate any program for expansion or substantial replacement during the period 1945–1950, it seeks to excuse such omission by saying that the progressive inflation of those years made such investment inadvisable, inasmuch as it was awaiting "the usual post-war deflation." Despite this explanation, the petitioner nevertheless insists that in computing its capital requirements, the inflation in prices which occurred during the period should be considered. The Tax Court, says the petitioner, committed error in failing to consider this factor. A large part of the record is devoted to the issue of economic trends, but we think the entire discussion irrelevant to this case. There is a basic inconsistency in the petitioner's position, for if petitioner expected deflation, and for that reason deferred making investments, then assuredly its reserves reasonably could not have taken into consideration the factor of inflation. In effect, its contention is that although it was awaiting deflation before investing, it is entitled to have its reasonable needs computed, after the event, in an amount sufficient to meet inflationary increases in cost which were not anticipated even as a possibility when the reserves in question were created. Logically, its intentions in withholding distribution of earnings had to be based on one theory or the other; we think they could not rest on both. The taxpayer could not justify its failure to use the reserve on the ground that it expected prices to decline, and yet, in computing its capital requirements, ask us

to measure them, not as it measured them at the time, but in the light of the subsequent inflationary rise in costs. We do not mean to intimate that inflationary economic trends may never be considered in calculating future corporate needs, and we are not called upon in this case to pass upon such a question. That the petitioner never considered such a factor in determining its needs and, indeed, anticipated just the opposite, is sufficient reason to uphold the Tax Court's failure to consider this contention.

### III.

We are in agreement with the findings of the Tax Court regarding a certain other group of allocations of reserves, as these findings are supported by substantial evidence. These are the reserves for self-insurance, for contract bonds, and for the corporate bond indebtedness.

Since petitioner was a self-insurer, it allocated, in its schedule of reserves, amounts thought reasonably necessary to cover possible losses in respect to workmen's insurance, public liability, and tornado and fire damage, totaling $500,000.00 at the end of 1944, and $650,-000.00 at the end of 1950. There can be no doubt that reserves for such contingencies are proper. While saving the premiums it would otherwise have had to pay, the petitioner assumed a direct liability in an undetermined amount, and the reserve was an estimate of this contingent liability. If petitioner wished to prove that the amounts needed for those purposes were larger than its own books indicated, then as the Tax Court pointed out, it should have produced actuarial evidence to support its contention. Inasmuch as petitioner failed to do so, it was certainly not unreasonable for the Tax Court to hold that the petitioner should be held to the amounts which it had set up on its books and which reflected what petitioner currently conceived to be its potential liability in these areas. Indeed, there is an absence of substantial evidence in the record to support a finding that larger amounts were required.

In the Tax Court's opinion and in the arguments made by the parties in this Court, there was considerable discussion concerning the fact that such losses as occurred were met out of current income without charging the contingent reserves which had been set up. The Commissioner apparently suggests the inference that the reserve was, therefore, unnecessary. This seems to us not to follow. When a contingency reserve is established for a single, specific purpose (for example, to anticipate an adverse judgment in a pending law suit), clearly, should the judgment be recovered against the taxpayer and satisfied out of current operating expenses, the need for the reserve would cease. However, where a reserve is established against a continuing hazard, the fact that losses as they occur are satisfied out of current earnings does not necessarily require the abandonment or reduction of the reserve in that amount. On the contrary, the circumstances may justify increased reserves, if experience indicates that initial estimates are inadequate; and similarly, they may require a reduction of reserves for the opposite reason. Consequently, we conclude that charging such expenditures to operating expenses, without reducing the reserve, is not a condemning fact. We uphold the Tax Court's conclusion disallowing additional reserves for self insurance on the ground that the petitioner failed to present proper evidence to indicate the need for reserves larger than appeared on its books.

Another item included in the schedule of contingent reserves was for "contract bonds." This reserve petitioner set up because it did not obtain performance bonds with respect to any of its job contracts. When a contractor engages to perform work, he is usually required to furnish a performance bond, but petitioner's business reputation was such that it was not called upon to furnish bond. Accordingly, it undertook to set up a reserve of $250,000.-00. It is not clear against what contingency this reserve was provided. The

fact that no bonding company guaranteed petitioner's performance did not increase the latter's liability which as contractor it would have had if bond had been furnished. The principal remains liable for the performance of his contract whether or not a bond has been furnished, and if the surety is called upon to make good a default the principal is liable to the surety. The contingency against which the petitioner ostensibly sought protection by means of a reserve was the kind of liability that every contractor has, in any event, for the performance of his contract. For this reserve, therefore, no justification appears.

Included in the schedule of contingent reserves in the company's books was an allocation for accrued bond interest, and petitioner claims that its reserves should include this as a financial need as well as the principal debt upon which the interest was calculated. Actually, the original schedule of reserves did not include the principal bond debt. The petitioner says, however, that the Tax Court has recognized but failed to give effect to it as a proper item of reserve. We do not read the Court's opinion as recognizing the propriety of a reserve for the bond principal and interest, nor could we agree that the evidence would have supported such a finding. The petitioner argued to the Tax Court the double contention, first that dividends were out of the question because bond indebtedness exceeded net income for each of the years in question, and second that were it not for petitioner's poor financial situation, earnings would have been utilized to discharge the bond debt and not to pay dividends.

 The Court properly rejected the first contention, pointing out that in a Section 102 inquiry, the proper test was a comparison of surplus with the reasonable needs of the business to determine the propriety of further accumulation of earnings, and not a comparison of the earnings in any one year with the outstanding corporate obligations. Regarding the second contention, the Court pointed out that petitioner's original capitalization consisted of $15,000.00 of capital stock and $3,000,000.00 in bonds owed to L. E. Smoot, a ratio of one to two-hundred, and that this ratio had been attacked in previous years by the Commissioner as a "thin capitalization," whereby the Commissioner sought to treat the bonds as capital stock and the interest as a dividend not deductible by petitioner. Though the cases were compromised and never adjudicated, the Tax Court here thought, in the light of these facts, that the petitioner's failure to discharge the bond debt was due not to any financial predicament of the petitioner, as claimed, but to its purpose to withhold payments in discharge of the debt for fear of again encountering an attempt on the Commissioner's part to treat such interest payments and reduction of bond principal as dividends. Furthermore, it was noted, payments could be postponed indefinitely at Mr. Smoot's discretion. In these circumstances, it is difficult to perceive any justification for creating a reserve for the bond indebtedness.

## IV.

Both in the original schedule for reserves and in the subsequent 1953 reappraisal of needs, figures were set out representing the estimated cost of entering into the ready-mix concrete business. The ready-mix concrete business had become the major part of the cement industry in Washington, as well as in the rest of the nation, and a large portion of the sand and gravel sales made by the petitioner was to ready-mix customers. Because of the powerful position attained by the ready-mix concerns, they had the ability to demand price concessions from producers such as petitioner by threatening to enter into competition with them in the sand and gravel business. The petitioner says that, therefore, throughout the five-year period under examination, the ready-mix industry presented a continuing threat to it, and that it became strategically important, in order to withstand the pressure from these customers, for the petitioner to be financially prepared at all times to enter

the ready-mix business. The further argument is that it was important to the petitioner that its ready-mix customers should know that if unduly pressed for price concessions and threatened with competition in the sand and gravel business, petitioner might respond by entering into competition with its ready-mix customers. This had the practical effect of offsetting the threats and demands of those customers. Therefore, petitioner's financial needs in each of the five years, as estimated in the 1953 appraisal, included $5,500,000.00 against the contingency of its entering into the ready-mix concrete business. This large figure was computed for the trial; the company's books for 1945–1950 showed only a contingent reserve of $500,000.00 for this item.

 The Tax Court, refusing to recognize that a reserve for such a need was reasonable, stated that "petitioner never planned or intended to go into the ready-mix business of its own free will, and the contingency which might have forced it to do so never developed." We think this was an improper way to dispose of the issue and that the reason assigned is not responsive to the claim asserted by the petitioner. If it was reasonable to anticipate a need for the petitioner to expand its business operations into the ready-mix field, it is immaterial that such expansion would not be voluntary. Nor is it a conclusive answer that the contingency never, in fact, arose to force petitioner to enter this new business area. These circumstances do not reach the issue. What is material is whether or not petitioner reasonably believed that it might be forced into the ready-mix business as a defensive measure, and whether it reasonably intended to enter such business when and if the imminence of the threat should demand it. The fact that such a step would be taken involuntarily would not make the need less compelling. If the petitioner reasonably feared the contingency it had the right to protect itself by providing a reserve for this purpose.

If an inquiry addressed to this point in the light of the foregoing discussion were resolved in favor of the petitioner the Court would then have to determine the sum which petitioner at the time believed necessary to effectuate the purpose, though obviously the Court need not have accepted petitioner's estimate of $5,500,000.00 Acceptance of the petitioner's estimate, or a figure approaching this amount, for all or for a portion of the years in question, would have substantially affected the petitioner's financial requirements and the Section 102 surtax.

The Court might have disagreed with the Petitioner that it had reasonable ground to feel such a threat, or it may well be that the threat disappeared and was reduced merely to a remote possibility. If so, then from that time forward, the continued maintenance of the reserve would not have been proper. But we cannot determine from the Tax Court's findings whether this is what occurred, for no findings were made on these specific points. There are statements in the record that petitioner at one time had engaged a stand-by salesman to handle orders for ready-mix equipment but that the crisis was averted. We cannot, however, determine whether avoiding the crisis merely reduced the imminence of the threat, postponing it temporarily, or whether the threat substantially disappeared. Nor is it clear whether these events occurred prior to 1945, the first of the taxable years in question, or at some later date, in which case, even assuming that the threat thereupon ended, the tax result for a portion of the five-year-period might have been considerably affected.

As a second reason for not recognizing petitioner's claimed need for retaining resources to finance its entry into the ready-mix concrete business, the Tax Court asserted that since petitioner's stock was owned by one person, "the money would still have been available to petitioner for such an emergency, even if distribution had been made." The au-

thorities cited by the Tax Court are Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, and Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086, and particularly the following sentence from the National Grocery Co. case [304 U.S. 282, 58 S.Ct. 938]: "Since Kohl was the sole owner of the corporation, the business would have been as well protected against unexpected demands for capital, and assured of capital for the purpose of any possible expansion, by his personal ownership of the securities as by the corporation's owning them." The very next sentence, however, in the opinion of the Supreme Court in the National Grocery Co. case is: "Moreover, no conceivable expansion could have utilized so large a surplus."

The first of these cited sentences must be read in the context of the whole opinion, from which it is plain enough that even without it, the decision would have been the same. Furthermore, were the statement deemed the controlling rationale of the decision, it would be authority for denying all sole stockholder corporations the right ever to maintain accumulations even for reasonable needs. The test expressed by the statute would then be completely abandoned. This, however, has not been the understanding of the Commissioner or the Tax Court, and if it were, disallowance would be automatic and there would be no point to the elaborate computations of reasonable needs which are found in the adjudicated cases.

Moreover, in an enlightening footnote, the Supreme Court pointed out that had the amount of $582,850.38, the accumulation of earnings in question, been distributed to the sole stockholder, he would have incurred additional surtax liability of only $90,744.56. Helvering v. National Grocery Co., supra, 304 U.S. at page 292, 58 S.Ct. at page 937, footnote 9. This tax would have been less than sixteen percent of the amount distributed. In the instant case the alleged Section 102 income for the tax years 1945 to 1950, inclusive, totaled $1,342,834.45, which, if distributed, would have resulted, as the Tax Court noted, in additional surtax liabilities to Mr. Smoot of almost $1,200,000.00, or approximately eighty-nine percent.

Clearly, in the tax economy of the period covered by the instant case, it can hardly be said that a distribution after deduction of income taxes by a high surtax bracket taxpayer is "available" for reinvestment in the corporation.

In any event, all that Justice Brandeis said in the quotation was that a corporation may not accumulate surplus for "unexpected demands." This is true regardless of whether it is owned by a single stockholder or by a larger group. Unexpected demands and unanticipated emergencies are not the reasonable needs for which a corporation may provide under Section 102 and are not contended for by this taxpayer. However, a contingency is a reasonable need for which a business may provide, if the likelihood, not merely the remote possibility, of its occurence reasonably appears to a prudent business firm.

■■■■ Accordingly, we think the Tax Court should decide whether petitioner reasonably believed that it would likely be forced into the ready-mix business during any of the taxable years in question and, if so, what sum was needed therefor.

The measure of the capital needed for such a purpose would be the extent and degree to which petitioner intended to engage in ready-mix activities and not the cost required to enter the business on the same scale as some other particular ready-mix concerns. Further, the Court should have determined when, if at all, the threat terminated and became too remote a possibility to justify reserves or, alternatively, whether petitioner abandoned its intentions, although the threat persisted. These issues demanded resolution and are not satisfied by a finding that petitioner never intended to go into the ready-mix business of its own free will, or by a finding that the feared contingency never developed.

Without determining the highly pertinent issues we have indicated, the Tax Court could not properly calculate petitioner's financial requirements, and the failure to make findings on these issues was error on its part.

It is not necessary for a corporation to create surplus reserves on its books to cover its future business needs, as the petitioner here did. The Statute imposes no such evidentiary requirement, nor is the mere book entry conclusive, in a Section 102 case, that the reserve is for a reasonably anticipated business need. Also, sufficient capital resources may be available regardless of any specific reserve on the books. The Tax Court may well give weight to the fact that only $500,000.00 was set up in this reserve and that this figure was not changed during the period covered by this case. Or the Court may conclude that the idea of going into the ready-mix business is not genuine, but merely a fictitious facade to cover an unreasonable accumulation of surplus; if so, it may disallow the item in its entirety.

### V.

In the course of a hypothetical analysis of petitioner's claim that it needed $3,-000,000.00 in working capital, including self-insurance reserves, the Tax Court treated $500,000.00 as adequate working capital for petitioner, exclusive of self-insurance reserves. This determination was based upon the formula that "accumulation of funds to meet operation expenses for at least one year is reasonable," citing J. L. Goodman Furniture Company, 11 T.C. 530. It is apparently true, as petitioner claims, that the Tax Court, in applying this formula, used only those indirect expenses on petitioner's profit and loss statements, which did not include the cost of goods sold. Petitioner did, however, have direct expenses, such as wages, fuel, and supplies, which, on its operating statements, were included in the cost of goods sold. These costs ranged from $484,647.00 to $778,-043.00 in the five years in question. Such expenses were not recognized by the Tax Court in applying its formula, and we cannot ascertain from the decision and opinion whether the exclusion of the direct operating costs was intentional or, as petitioner asserts, inadvertent.

In the Goodman Furniture Co. case, the Tax Court did not limit the working capital requirements of the taxpayer in that case to an amount sufficient to meet one year's operating expenses. The Tax Court in that case included in the calculation of working capital, allowances for inventories, accounts receivable and, *in addition*, funds sufficient to meet one year's operating expenses; and furthermore, the Tax Court in that case was dealing with a retail installment merchant.

Obviously, the working capital formula cited by the Tax Court in the instant case was only part of the formula used in the Goodman Furniture Co. case. Perhaps the Tax Court, in citing the formula, believed that in the instant case it need make no allowance for direct expenses making up cost of goods sold because of weight given to evidence presented at the trial. But we cannot determine this from the Tax Court's decision.

Of course, even the complete formula used in Goodman to determine working capital may not be applicable without discrimination in all cases. Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors.

In our view, the Tax Court should make a determination of petitioner's working capital needs based upon the foregoing considerations. A clear disclosure of the method by which the Court computed the working capital required would not only go a long way to dispose of the issues in the instant case but could be useful to the legal and accounting professions as a future guide.

## VI.

The final contention of the petitioner is that the deficiency notices were void, because issued as a result of improper administrative procedures. It is asserted that the officials who signed the deficiency notices did not personally know the facts on which they acted, but accepted the recommendations of subordinates. The record provides ample basis for the Tax Court's finding that in determining the deficiency, subordinate officials made the necessary examination of petitioner's tax returns. The official authorized to sign the notices is not required to know all of the details of fact in each case, but he may act on the investigation and findings of those responsible to him. To hold otherwise would burden and impede the administration of the law beyond the hope of practical efficiency.

It is also argued that the notice contained no determination of what the resulting taxes would have been upon distribution of earnings to petitioner's sole stockholder, Columbia, and to the latter's sole stockholder, L. E. Smoot. This contention is likewise lacking in merit. Not only were all the facts pertaining to the tax returns of Mr. Smoot individually, as well as of the two corporations, which he controlled, in the possession of the Commissioner's representatives, but, as the Respondent points out, these facts had been the subject of intensive inquiry and repeated conferences between the taxpayer and the Commissioner. We agree with the Tax Court that the Commissioner's assertion of Section 102 surtax inferentially carried with it the determination that failure to distribute earnings resulted in tax savings to the stockholders. J. M. Perry & Co., Inc., v. Commissioner, 9 Cir., 120 F.2d 123.

The broad conclusions in the final paragraph of the Tax Court's decision as to the absence of reasonable need are based upon its step by step analysis of petitioner's claims. Inasmuch as we have shown that as to the issues of additional working capital and entry into the ready-mix business, the reasons assigned for disallowance are inadequate, the conclusions drawn do not follow. This is not to say that the Tax Court may not upon rehearing reach the same conclusions, but for proper reasons.

Accordingly, we affirm the Tax Court on all issues except as to the working capital (exclusive of self-insurance reserves) necessary in petitioner's business and as to the ready-mix business, and remand the case to the Tax Court for findings in those respects in accordance with the views expressed in this opinion.

Reversed and remanded.