MOTEL ASSOCIATES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Motel Associates, Inc. v. Commissioner
Docket No. 24952-82.
United States Tax Court
T.C. Memo 1986-426; 1986 Tax Ct. Memo LEXIS 184; 52 T.C.M. (CCH) 429; T.C.M. (RIA) 86426; September 10, 1986. R. Wayne Byrd, for the petitioner. Julian A. Fortuna, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Year Ended
Deficiency
March 31, 1979
$26,713.23
March 31, 1980
27,078.70
March 31, 1981
21,345.78
*186 The sole issue for determination is whether petitioner is liable for the accumulated earnings tax imposed by section 531. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner was a corporation with its principal place of business at Florence, South Carolina, when its petition was filed in this case. Petitioner was incorporated in South Carolina on August 2, 1961. Petitioner was formed "to engage in the ownership and operation of motels and all other things entered into thereto and to acquire, own, and sell real estate incident to the purposes of the corporation." The original contribution to the capital of petitioner was $25,000. No further capital contributions were made between the date of incorporation and the date of trial. Petitioner constructed or purchased three motels and two restaurants. Petitioner constructed the Hornes Motor Lodge *187 in Florence, South Carolina, in 1962 at a cost of approximately $475,000. In February of 1967 petitioner purchased the Litchfield Inn in Litchfield Beach, South Carolina, at a cost of $550,000. The Litchfield Inn was sold in 1973. The Thunderbird Motor Inn in Florence, South Carolina, was constructed in 1969 at a cost of $600,000. Subsequently, petitioner constructed 54 additional units at the Thunderbird Motor Inn at a cost between $200,000 and $250,000 and added a lounge and meeting rooms. In August of 1972, petitioner acquired the Hornes Restaurants in Florence, South Carolina, and Augusta, Georgia, at a cost of $125,000 for both restaurants. Petitioner financed its construction, purchases, and other expenditures, in part, through corporate borrowing. From the date of incorporation through March 31, 1978, petitioner had borrowed approximately $1,963,000 and paid approximately $1,192,000 to retire outstanding liabilities resulting in approximately $771,000 in outstanding liabilities at March 31, 1978. From the period April 1, 1978, through March 31, 1981, petitioner incurred approximately $16,000 in additional debt and paid approximately $66,000 to retire outstanding liabilities *188 resulting in approximately $721,000 in outstanding liabilities at March 31, 1981. Petitioner's largest outstanding loan during the years April 1, 1978, through March 31, 1981, was to People's Federal Savings and Loan Association. This loan was for a period of 20 years commencing in 1973. The monthly payments on this loan were $5,395.20. During the period April 1, 1978, through March 31, 1979, the outstanding balance on the loan was approximately $500,000, an amount substantially identical to petitioner's loan-term liabilities. Long-term debt was reduced by $76,294, $31,530, $24,118, and $26,121 in fiscal years ended March 31, 1979, 1980, 1981 and 1982, respectively. Petitioner had always made timely payments on the loan and did not intend to accelerate payment of the loan balance. Petitioner's income was primarily attributed to the operation of its motels and restaurants. Petitioner was an accrual basis taxpayer. For the years ended March 31, 1971, through March 31, 1983, petitioner's approximate cash basis income and expenses and approximate cash flow from operations [2] were as follows: Year Ended
Income
Expenses
Cash Flow
March 31, 1971
$947,171.68
$834,856.19
$112,315.49
March 31, 1972
1,060,227.14
880,011.82
180,215.32
March 31, 1973
1,362,150.06
1,218,065.35
144,084.71
March 31, 1974
1,672,045.00
1,311,492.00
[3] 360,553.00
March 31, 1975
1,397,975.00
1,314,936.00
83,039.00
March 31, 1976
1,666,478.00
1,535,728.00
[4] 130,750.00
March 31, 1977
1,903,718.00
1,752,838.00
150,880.00
March 31, 1978
1,893,206.00
1,721,768.00
171,438.00
March 31, 1979
2,037,230.00
1,839,583.00
197,647.00
March 31, 1980
2,241,347.00
2,015,223.00
226,124.00
March 31, 1981
2,570,619.00
2,308,959.00
261,660.00
March 31, 1982
2,972,892.00
2,605,004.00
367,888.00
March 31, 1983
2,885,192.00
2,520,661.00
364,531.00
*189 During the same years petitioner acquired depreciable assets used in its trade or business. These assets were reported on petitioner's balance sheet at the following costs: [5]
Year Ended
Cost of Assets
March 31, 1971
$26,056.17
March 31, 1972
49,033.12
March 31, 1973
325,715.43
March 31, 1974
132,923.00
March 31, 1975
40,581.00
March 31, 1976
28,462.00
March 31, 1977
42,371.00
March 31, 1978
88,420.00
March 31, 1979
86,511.00
March 31, 1980
[6] 297,389.00
March 31, 1981
191,677.00
March 31, 1982
89,303.00
March 31, 1983
190,637.00
*190 Income statements were prepared for petitioner on a quarterly basis. Petitioner's retained earnings reported on its Forms 1120 for the years at issue were as follows: Year Ended
Amount
March 31, 1979
$653,455
March 31, 1980
751,923
March 31, 1981
827,988
Petitioner did not establish reserves for any of those years. Petitioner's current assets and current liabilities for the years at issue as reported on its yearend financial stateents were as follows: Current Assets
March 31, 1979
March 31, 1980
March 31, 1981
Cash: Petty Cash
$ 3,450.00
$ 3,450.00
$ 4,250.00
Non-Interest-
Bearing Checking
Accounts
290,378.74
228,439.51
262,793.90
Certificates of
Deposit
46,604.92
23,827.32
Savings Accounts
92,160.10
98,061.18
111,252.11
$432,593.76
$353,778.01
$378,296.01
Accounts and
Notes Receivable
55,810.00
111,193.00
91,354.00
Inventory
11,098.00
11,098.00
14,000.00
Other
32,522.00
$532,023.76
$476,069.01
$483,650.01
Current Liabilities
March 31, 1979
March 31, 1980
March 31, 1981
Accounts Payable
$ 70,211.00
$102,856.00
$ 76,422.00
Mortgages, Notes
and Bonds Payable
in One Year
98,848.00
112,773.00
150,454.00
Other Current
Liabilities
34,442.00
29,977.00
35,034.00
$203,501.00
$245,606.00
$261,910.00
*191 In addition to the current assets listed on its financial statements, petitioner listed the following "Other Assets" in each of the years at issue: Asset
Cost
Heart of Spartanburg Stock
$ 5,000.00
Hornes Motor Lodge of Augusta, Inc. Stock
15,000.00
Fairlane/Litchfield Company, Inc.
185,520.00
$205,520.00
Respondent concedes that the Heart of Spartanburg stock was worthless. Petitioner had acquired 25,090 shares of Fairlane/Litchfield Company, Inc. common stock as part of the purchase price for the Litchfield Inn. Minutes of the Board of Directors of Fairlane/Litchfield Company, Inc. disclose the following purchases of the Fairlane/Litchfield Company, Inc. stock: Date
Transaction
March 31, 1976
40,000 shares at $7.39 per share
August 31, 1977
14 shares at $7.50 per share
November 7, 1977
346 shares at $7.50 per share
February 15, 1978
466 shares at $7.50 per share
May 30, 1978
400 shares at $7.50 per share
February 1, 1979
17,830 shares at $7.50 per share
March 28, 1980
13,373 shares at $7.50 per share
May 9, 1980
9,333 shares at $7.50 per share
June 17, 1982
317,670 shares at $13.00 per share
Petitioner's shares *192 of the Fairlane/Litchfield Company, Inc. were sold on or about October 10, 1983, for a total purchase price of $313,625.00 or $12.50 per share. Petitioner's president, F. M. Rogers, III ("Rogers Sr."), would have pursued the sale of the stock earlier, but he was not aware of any market for the stock. The sale of petitioner's stock was within a reasonably short period of time after petitioner attempted to market it. E. E. Stone was the president of petitioner until his death in December of 1977. Rogers Sr. was a corporate officer who assisted in petitioner's management. When Stone died Rogers Sr. became the president of petitioner and was solely responsible for its management and operation. Rogers Sr. was the president of petitioner during the years at issue. The other corporate officers were Hugh L. Willcox, vice-president, E. L. Stone, vice-president, and Mildred S. Tyner, secretary. Petitioner's directors during the years at issue were Rogers Sr., Hugh L. Willcox, E. L. Stone and Sara Lawson. Decisions of the directors were essentially made on an informal basis by Rogers Sr. and Hugh L. Willcox. Rogers Sr. operated petitioner's business from a cash basis perspective. *193 Rogers Sr. did not review pro forma budgets or financial statements in order to make determinations as to petitioner's operations. Rogers Sr. would check the bank balances each week to determine petitioner's operating condition. The bank balances would be at their highest point of $250,000 to $300,000 at the beginning of each month and would decrease to as low as $100,000 by the tenth or fifteenth day of each month when petitioner's bills were paid. Petitioner never had any problems obtaining credit for goods or services. When Rogers Sr. became president of petitioner, the motel properties had deteriorated and renovation and replacement was required to maintain the quality of the motels. Rogers Sr. estimated that the cost of renovations would be between $2,200 and $2,700 per room at the Hornes Motor Lodge and $1,250 per room at the Thunderbird Motor Inn. The Hornes Motor Lodge had 109 rooms and the Thunderbird Motor Inn had 135 rooms. Other expenditures which Rogers Sr. anticipated were repaving the parking lots at both motels and a sewage disposal hookup at the Thunderbird Motor Inn. Repaving costs were $11,849.75, $44,470.60, and $16,104.00 in fiscal years 1980, 1981 and *194 1982, respectively. The sewage disposal hookup was made subsequent to the years at issue for a total cost of approximately $45,000. Rogers Sr. intended to finance these expenditures from cash flow and not through borrowing. At the time Rogers Sr. became petitioner's president, an oil embargo was anticipated. In 1973 and 1974 an oil embargo had decreased the rate of occupancy of hotel and motel rooms in the United States because fewer people were traveling as a result of oil shortages. Rogers Sr. was aware of the impending oil embargo at the time he assumed his position as petitioner's president. Rogers Sr. believed that the effect on petitioner of the oil embargo in 1973 and 1974 was a 20 to 25 percent decrease in occupancy at the two motels without a significant decrease in the expenditures of operating and maintaining the facilities. In order to decrease expenses during 1973 and 1974, E. E. Stone and Rogers Sr. did not receive a salary. Based on his experience, Rogers Sr. believed that an additional $150,000 cash on hand in the years at issue would be required to prepare for an oil embargo. Although Rogers Sr. roughly approximated the effect of the 1973 and 1974 oil embargo *195 on petitioner, a detailed analysis of the effect of the oil embargo was not made until petitioner was under examination by respondent for the years at issue. During the years at issue Rogers Sr. and the Estate of E. E. Stone or its successor the E. E. Stone Trust each owned between 35.37 percent and 37.50 percent of the authorized and issued shares of the corporation and Hugh L. Willcox owned between 23.58 percent and 25 percent of the authorized and issued shares. Elinor Stone Lyda owned 5.66 percent of the authorized and issued shares at March 31, 1979, and March 31, 1980. Her shares were redeemed by petitioner during the year ended March 31, 1981, at a cost of $10,653.00. The beneficiaries of the E. E. Stone Trust were E. L. Stone and Sara Lawson, E. E. Stone's son and daughter, respectively, and their lineal descendants. E. L. Stone and Sara Lawson were to receive annual distributions of income from the trust during their lifetimes, and at their death the trust principal was to pass to their lineal descendants. E. L. Stone and Sara Lawson were both living during each of the years at issue. Petitioner or its shareholders owned a majority interest in two other corporations *196 which operated motels. These corporations were Hornes Motor Lodge of Augusta, Inc., ("Hornes") and Thunderbird of Greenville, Inc. ("Thunderbird"). Petitioner, Rogers Sr., the Estate of E. E. Stone or its successor the E. E. Stone Trust and Hugh L. Willcox each owned one-sixth of the authorized and issued stock of Hornes, and Rogers Sr. and the Estate of E. E. Stone or its successor the E. E. Stone Trust each owned one-third of the authorized and issued stock of Thunderbird. From the date of incorporation through the years at issue, petitioner had never paid a dividend to its shareholders. However, in each of the years at issue, the shareholders considered and rejected a dividend payment. No specific requirements for these funds were enumerated in the shareholders' minutes although general statements as to the cost of repairs, maintenance, and other items were incorporated in the minutes. Petitioner did make loans to or for the benefit of its shareholders in the total amount of $38,619.03. The full amount of these loans were outstanding through June 30, 1980. These loans were not evidenced by formal documents or corporate minutes and had no stated interest or due dates. In addition *197 during the years at issue three of the four individuals who directly or indirectly owned 94.44 percent to 100 percent of the shares authorized and issued by petitioner were employed by petitioner, Thunderbird or Hornes and received compensation from these corporations. Thunderbird paid dividends during its taxable years ended January 31, 1979, January 31, 1981, and January 31, 1982, in the aggregate amounts of $2,550.00, $15,048.00, and $120,000.00, respectively. Rogers Sr.'s son, Frank M. Rogers IV ("Rogers Jr."), was a certified public accountant who prepared financial statements and tax returns for petitioner, Hornes and Thunderbird. Rogers Jr. also prepared tax returns for the Estate of E. E. Stone, the E. E. Stone Trust and Rogers Sr. Rogers Sr. was aware of the Federal income tax effect of a dividend to petitioner and to himself individually. Dividend distributions from petitioner were not considered in the individual tax planning for Rogers Sr. Had a dividend been declared in the amounts determined by respondent, the dividend amount received, net of Federal income tax attributable to the dividend, by each of petitioner's shareholders, other than Elinor Stone Lyda, would *198 have been less than 50 percent of the total dividend. OPINION Section 531 imposes an accumulated earnings tax on the "accumulated taxable income" of certain corporations. With exceptions not applicable here, a corporation which is subject to the accumulated earnings tax is one formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation (the "prohibited purpose"). Sec. 532(a). "Accumulated taxable income" is generally defined as taxable income, with certain adjustments, less earnings and profits retained for the reasonable needs of the business. Sec. 535. The subjective inquiry is made with respect to the state of mind of those who control the corporation. Bahan Textile Machinery Company v. United States,453 F.2d 1100, 1101 (4th Cir. 1972). However, the fact of an accumulation of earnings and profits beyond the reasonable needs of the business is determinative of the prohibited purpose unless the corporation proves to the contrary by a preponderance of the evidence. Sec. 533(a). *199 The burden of proof as to whether an accumulation is unreasonable is on respondent if the taxpayer submits a statement of the grounds on which he relies and sufficient facts to support such grounds to establish that all or any part of the earnings and profits have not been allowed to accumulate beyond the reasonable needs of the business. Secs. 534(a), (c). Here, petitioner submitted a statement pursuant to section 534(c). This statement identified retirement of business indebtedness, replacement of capital assets, provision of sufficient working capital to maintain bank accounts at acceptable levels to meet normal business demands, and retention of sufficient earnings and profits to meet contingencies as reasons for accumulation. By motion filed on February 21, 1984, petitioner requested a ruling on the burden of proof under section 534(a)(2) based on its statement. The Court granted petitioner's motion and determined that the burden of proof with respect to debt service was on respondent. The Court further determined that the burden of proof with respect to the other grounds was on *200 petitioner. The statutory framework of the accumulated earnings tax provisions focuses on whether the corporation's earnings and profits for a year were accumulated in excess of the amount necessary to meet its reasonable business needs at the end of the year. Although the measure recited by the statutory provisions is accumulated earnings and profits, the Court must look to the quantity of assets available to meet reasonable business needs. Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corporation v. Commissioner,274 F.2d 495, 501 (4th Cir. 1960); Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 282 (1983). The liquidity of such assets is normally crucial, but an investment in nonliquid assets which are unrelated to or unnecessary for the corporation's business will not avoid the accumulated earnings tax. Faber Cement Block Co. v. Commissioner,50 T.C. 317, 328 (1968). The determination *201 of whether an accumulation is in excess of reasonable business needs is a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). Normally, we are reluctant to substitute our judgment for the business judgment of management who are most familiar with the operating condition of the corporation. Snow Manufacturing Co. v. Commissioner,86 T.C. 260, 269 (1986); Faber Cement Block Co. v. Commissioner,supra at 329. The reasonable business needs of a corporation include future anticipated business needs. Sec. 537(a)(1). However, such anticipated needs must be supported by a plan which is "specific, definite, and feasible and some steps must have been taken towards its realization." Hogg's Oyster Co., Inc. v. United States,676 F.2d 1015, 1018 (4th Cir. 1982). The requirement of specificity of plan applies to closely held corporations as well as to publicly held corporations although the formalities will differ. Hogg's Oyster Co., Inc. v. United States,supra at 1018; Bahan Textile Machinery Company v. United States,supra at 1102. The reasonable *202 needs of a business also include reserves for contingencies. Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d 197, 206 (4th Cir. 1957); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 471 (1965). A contingency is a reasonable need if "the likelihood, not merely the remote possibility, of its occurence [sic] reasonably appears to a prudent business firm." Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d at 206. A contingency reserve is no longer a reasonable business need if the corporation abandons its plans to meet the threat of the contingency. Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d at 206. Here, our determination is based on an analysis of the assets available to make expenditures for petitioner's reasonable business needs. Petitioner argues that its assets are not in excess of its reasonable business needs while respondent argues to the contrary. The issues raised by the parties' differing calculations are whether the Fairlane/Litchfield Company, Inc. stock and the Hornes Motor Lodge of Augusta, Inc. stock should be considered in determining petitioner's liquidity, whether *203 respondent correctly determined petitioner's operating cycle needs under the formula employed in Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200, as modified by W.L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977), whether a reserve for contingencies was a reasonable business need, and whether petitioner had future anticipated business needs in excess of the amounts determined by respondent. We must first consider whether the Fairlane/Litchfield Company, Inc. stock and the Hornes Motor Lodge of Augusta, Inc. stock should be included as assets available to meet petitioner's business needs. The total cost of this stock reported on petitioner's balance sheet for the years at issue was $200,520. Respondent contends that the fair market value of the Fairlane/Litchfield Company, Inc. stock, less any anticipated costs of sale, would be $188,175, but he accepts the $15,000 cost reported on the balance sheet as the fair market value of the Hornes Motor Lodge of Augusta, Inc. stock. Rogers Sr. was not aware that there was a market for the Fairlane/Litchfield Company, Inc. stock. However, *204 there were stock sales during the years at issue, and there is nothing in the record to suggest that petitioner could not have readily sold its stock. Likewise, there is no evidence that the stock of Hornes Motor Lodge of Augusta, Inc. could not be sold. The sales price of the shares of Fairlane/Litchfield Company, Inc. stock sold during the years at issue was $7.50 per share, or $188,175 for the 25,090 shares owned by petitioner. Consequently, we conclude that the amount of $203,175 representing the potential sales price of 25,090 shares of Fairlane/Litchfield Company, Inc. stock and the cost basis of Hornes Motor Lodge of Augusta, Inc. stock must be included in the amount available to meet petitioner's reasonable business needs during the years at issue. We must next consider whether respondent correctly determined petitioner's operating cycle needs using the Bardahl formula. The Bardahl formula was fashioned to provide some mathematical certainty when there was a time difference between the date that expenditures were made for the production of income and the ultimate collection of such income. The Bardahl formula is not mandated in every case. See, e.g., Dielectric Materials Co. v. Commissioner,57 T.C. 587, 599 (1972). *205 We perceive that application of the Bardahl formula here, although giving an appearance of mathematical certainty, may not be entirely accurate. Nevertheless, we agree with respondent's conclusion reflected by such application that petitioner's need for liquid assets for the year end succeeding operating period was negligible. Petitioner has not shown that this conclusion is in error. The record indicates that petitioner either has a rapid rate of payment on accounts receivable or receives cash for its goods sold and services rendered. Petitioner's inventory [7] which consists of food and bar items is undoubtedly, in substantial part, perishable and would be used or disposed of in a short period of time. Expenses were paid on a monthly basis. Clearly, there was not a significant time difference between the date operating expenditures were made and income received, and petitioner did not require substantial amounts of liquid assets in order to maintain operations prior to the receipt of cash from these operations. This conclusion is supported by the fact that Rogers Sr. determined petitioner's operating expenditures by examining weekly bank balances. Consequently, we agree *206 with respondent's determination that petitioner's operating cycle needs for the succeeding periods were $36,069 and $33,443 for the years ended March 31, 1980, and March 31, 1981, respectively. For the year ended March 31, 1979, we find that petitioner's operating cycle needs were zero rather than respondent's figure of ($6,614). We decline to adopt respondent's calculation for the year ended March 31, 1979, because it, in effect, increases petitioner's net assets by assets which are not in existence at yearend. Finally, we must determine whether petitioner had other reasonable business needs in excess of the amounts determined by respondent. Petitioner argues that the amounts allowed by respondent should be increased for additional amounts for debt service, a contingency amount of $500,000 to provide additional operating funds for an anticipated oil embargo, and an additional $137,000 contingency amount for replacement of capital assets *207 and future anticipated expenditures for renovation and replacement of operating assets at the two motels owned by petitioner. Initially, we note that respondent's calculation of petitioner's net liquid assets reflects that portion of long-term indebtedness which would be payable in the succeeding year. Petitioner did not contemplate accelerating its payment of long-term indebtedness. Under these circumstances we do not find that an accumulation for debt service in excess of the amounts due in the succeeding year to be reasonable. Consequently, respondent has met his burden of proof as to this item under our section 534(c) order. Petitioner also maintains that an accumulation of $500,000 was necessary to meet its expenses if an oil embargo occurred. Rogers Sr., whom we found to be a credible witness, testified that the amount actually required should an oil embargo occur would be $150,000. Rogers Sr. did not arrive at this figure through an analysis of petitioner's financial statements but merely estimated the potential effect of an oil embargo based on his knowledge of the impact on petitioner of the oil embargo in 1973 and 1974. While we find Roger Sr.'s belief that additional *208 funds might be required to meet expenses in the event of an oil embargo to be honest, we do not find that sufficient analysis was undertaken to determine whether the accumulation was actually required. Further, the record does not support a finding that an accumulation would have been required to meet expenses had an oil embargo occurred. Petitioner further maintains that an accumulation was required to meet anticipated future needs for renovation and replacement of operating assets at the two motels which it owned. It is clear from the record that specific and definite plans to make these expenditures existed during each of the years at issue. Petitioner was a closely-held corporation operated and managed by Rogers Sr.It was Rogers Sr. who was responsible for making decisions relating to petitioner. Rogers Sr. testified, and we so find, that in December of 1977 and continuing through the years at issue he had specific plans to make expenditures for renovations, replacements and other items. Because of the manner in which petitioner was operated, we do not find it significant that these plans were not enumerated in detail in any formal documentation. We do note that the shareholders' *209 minutes show that the shareholders were generally apprised of the plans. In addition we find it highly significant that these plans were consummated during the years at issue. In order to permit accumulations for future business needs, it is not the formalities which evidence a plan that are determinative but a finding that the plan was "specific, definite, and feasible and some steps [were] taken towards its realization." Hogg's Oyster Co., Inc. v. United States,supra at 1018. These requirements have been met here. Based on the testimates provided by Rogers Sr., the cost of renovation of the rooms at the two motels would be between $408,550 and $463,050. Rogers Sr. also anticipated that there would be repaving costs at both motels and a sewage disposal hookup cost at Thunderbird Motor Inn. Repaving costs were $11,849.75, $44,470.60 and $16,104.00 in fiscal years 1980, 1981, and 1982, respectively. The sewage disposal hookup was made subsequent to the years at issue at a cost of approximately $45,000. Petitioner did, in fact, make expenditures substantially in excess of prior years' expenditures during the years at issue and the following years. *210 Respondent limited the amount of accumulation for renovation and replacement of operating assets to the amount of actual expenditures in each succeeding year. However, it is clear that the reasonable business needs for each year, both for future renovation and replacement and current acquisitions, were in excess of the amounts allowed by respondent. We have determined that the following amounts represent reasonable business needs for renovation and replacement: March 31, 1979
March 31, 1980
March 31, 1981
Renovation of Motels [8]
$355,168.33
$222,232.84
$171,951.45
Repaving [9]
60,574.60
16,104.00
0    Sewage Hook-up
45,000.00
45,000.00
45,000.00
Other Anticipated
Operating Asset
Expenditures for the
Succeeding Year [10]
164,453.51
141,395.61
71,386.90
$625,196.44
$424,732.45
$288,338.35
There is no evidence that an additional contingency reserve in the amount of $137,000 for the replacement of capital assets was a reasonable need of petitioner's business. *211 Based on the record before us, we have determined that the assets available to meet petitioner's reasonable business needs compared to the reasonable needs of its business are as follows: March 31, 1979
March 31, 1980
March 31, 1981
Available Assets [11]
$531,697.76 $433,638.01 $424,915.01 Less: Operating Cycle
Needs
(0)
( 36,069.00)
( 33,443.00)
Stock Redemption
(0)
( 10,653.00)
(0)
Operating Asset
Expenditures
(625,196.44)
(424,732.45)
(288,338.35)
($ 93,498.68)
($ 37,816.44)
$103,133.66 Having compared petitioner's reasonable business needs with its net liquid assets, we must determine whether petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of another corporation. Sec. 532(a). Respondent concedes that petitioner was not formed with the prohibited purpose, and the issue in this case is limited to whether petitioner was so availed of. Based *212 on our examination of the record, we find that no presumption of the prohibited purpose pursuant to section 533(a) applies with respect to fiscal years ended March 31, 1979, and March 31, 1980. With respect to fiscal year ended March 31, 1981, the presumption under section 533(a) does apply, and petitioner must prove absence of the prohibited purpose by a preponderance of the evidence. Petitioner's operation and management during the years at issue rested with Rogers Sr. We found Rogers Sr. to be a credible witness. His testimony underscores the fact that he was an extremely conservative businessman who sought to provide an adequate amount of capital for any contingency. While obviously a successful businessman, Rogers Sr. did not rely on petitioner's financial statements but relied, in whole, on his weekly examination of petitioner's bank balances. The largest portion of petitioner's cash at each yearend was in non-interest-bearing checking accounts indicating that these funds were to be utilized on a current basis for expenses. Retention of additional cash amounts was not inconsistent with Rogers Sr.'s stated goal of providing financing for renovation and replacement. We *213 note that Rogers Sr. assumed his position as petitioner's president at a time when petitioner's assets were in need of renovation and replacement. Petitioner did, in fact, make substantial expenditures for renovation and replacement of assets at its two motels. Unlike the situation prior to E. E. Stone's death, petitioner had a major shareholder which was not active in its business. Rogers Sr. indicated his concern that a distribution might deplete corporate funds necessary for future corporate endeavors and that the current shareholders would be unwilling to contribute additional capital to petitioner if necessary. Although Rogers Sr. recognized that borrowing to fund such activities would be possible, past experience had indicated that he and Hugh L. Willcox would be subject to personal liability on any loans to petitioner. The record indicates that the amount of available assets retained for the fiscal years ended March 31, 1979, and March 31, 1980, was not unreasonable in light of the renovation and replacement contemplated. Consequently, we find that petitioner was not availed of for the prohibited purpose for fiscal years ended March 31, 1979, and March 31, 1980. In addition *214 we note that irrespective of our findings as to the prohibited purpose, the accumulated earnings tax credit under section 535(c) would eliminate the amount against which the tax would be imposed for fiscal years ended March 31, 1979, and March 31, 1980. Chaney & Hope, Inc. v. Commissioner,supra at 281. The determination for fiscal year ended March 31, 1981, presents a different situation. Here, petitioner must prove by a preponderance of the evidence that it was not availed of for the prohibited purpose. By March 31, 1981, petitioner had, in fact, made a substantial amount of the expenditures contemplated for renovation and replacement at the motels. At the same time petitioner's cash flow and available assets had increased. Even Rogers Sr., whose sole indicator of the operating condition of petitioner was its bank balances, clearly must have been aware that the available liquid assets were sufficient to permit a dividend distribution without fear that known potential liabilities would require additional capital. Rogers Sr. was aware of the Federal income tax consequences of a dividend distribution to himself and to petitioner, and petitioner has not shown *215 that the failure to distribute a dividend was not, in part, the consequence of Rogers Sr.'s reluctance to recognize dividend income. Consequently, we find that petitioner was availed of to avoid the income tax with respect to its shareholders for the year ended March 31, 1981, in the amount determined by respondent. [12]
In our view this case illustrates what appears to be an overzealous attempt on the part of respondent to apply the penalty provisions of section 531 for certain years. We believe that a pragmatic approach should be taken when evaluating decisions which result from the exercise of the business judgment of those who manage or operate a corporation. Clearly, here, a business judgment was made to make certain expenditures for the motels. This judgment was incorporated into a plan which was in effect over a number of years, and the amounts related to this plan should have been reflected as reasonable business needs *216 for 1979 and 1980. On the basis of this record, Decision will be entered for the petitioner for fiscal years 1979 and 1980 and for the respondent for fiscal year 1981.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. An accurate approximation of petitioner's cash basis income can be computed from the accrual basis financial statements. Petitioner's accounts receivable, as reflected in Form 1120, U.S. Corporation Income Tax Return, Schedule L, Balance Sheets, in each of these years were approximately five percent of gross receipts, and other assets reflected in the balance sheets which might be uncollected receivables relating to current income are nominal. Consequently, there would only be a slight discrepancy between cash and accrual basis accounting for income. Petitioner's accounts payable and other liabilities are a more significant percentage of expenses, and it is probable that the cash basis expense figures are overstated. As a result the cash flow amounts for each year are probably conservative. ↩
3. This amount includes proceeds attributable to gain from the disposition of property. A portion of the proceeds was paid in stock.The cash flow amount includes the cash basis of stock received in the amount of $185,200 but not the proceeds attributable to the basis of the property disposed of in the amount of $380,493. Consequently, the cash flow amount may be understated. ↩
4. This amount includes proceeds attributable to gain from the disposition of property. The cash flow amount does not include proceeds attributable to the basis of the property. Consequently, the cash flow amount may be understated. ↩
5. These amounts are derived from balance sheet information and supporting schedules submitted with petitioner's Forms 1120. ↩
6. Respondent's calculations netted the total asset acquisition against $125,000 in indebtedness. There is no evidence that borrowing was contemplated at the end of fiscal year 1979. In fact petitioner's president testified, and we so find, that he contemplated that acquisitions would be financed without borrowing. In addition, we are unable to determine that any of petitioner's indebtedness related to the assets acquired.↩
7. Petitioner's inventories reflected in its balance sheets are constant, indicating that petitioner does not nominate its inventory as such but simply uses a cost of goods sold account without reflecting beginning and ending inventories.↩
8. We have used the average of estimated costs for base expenditures or $435,800. This amount has been reduced in each year for the amount of expenditures made in the fiscal year and preceding fiscal years which apparently relate to renovation and replacement. ↩
9. Repaving costs for the succeeding year are included as "Other Anticipated Operating Asset Expenditures for the Succeeding Year." ↩
10. These amounts were calculated by reducing expenditures for operating assets made in the succeeding fiscal year by the cost of operating assets we have determined are associated with petitioner's plan for renovation and replacement at the two motels.↩
11. Computed as working capital of petitioner plus the fair market value of its investment in the Fairlane/Litchfield Company, Inc. stock and the Hornes Motor Lodge of Augusta, Inc. stock.↩
12. Although we do not accept respondent's computation of reasonable business needs for the year ended March 31, 1981, we find that respondent's determination under sec. 535↩ of the amount of accumulated taxable income for March 31, 1981, is correct.